**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| TIFFANY HILL, individually and on behalf of all others similarly situated, | No. 20-35838 |
| *Plaintiff-Appellee,* | D.C. No. 2:12-cv-00717-JCC |
| v. | |
| XEROX BUSINESS SERVICES, LLC; LIVEBRIDGE INC, an Oregon Corporation; AFFILIATED COMPUTER SERVICES INC, a Delaware Corporation; AFFILIATED COMPUTER SERVICES LLC, a Delaware Limited Liability Company, | OPINION |
| *Defendants-Appellants.* | |

Appeal from the United States District Court
for the Western District of Washington
John C. Coughenour, District Judge, Presiding

Argued and Submitted August 12, 2021
Seattle, Washington

Filed February 3, 2023

Before:  Carlos T. Bea, Daniel A. Bress, and Lawrence
VanDyke, Circuit Judges.

Opinion by Judge Bea;
Dissent by Judge VanDyke

## SUMMARY[*]

### Arbitration

The panel affirmed the district court's order denying
Xerox Business Services, LLC ("XBS")'s motion to compel
arbitration pursuant to a 2002 Dispute Resolution Plan
("2002 DRP"), arising from a putative class action brought
by XBS call center agents alleging Washington state law
employment compensation claims based on diversity
jurisdiction.

Appellee Tiffany Hill worked at an XBS call center and
was compensated according to a proprietary system of
differential pay rates known as Achievement Based
Compensation ("ABC").  Section 4 of the 2002 DRP
required XBS and its agents to submit "all disputes" to
binding arbitration for final and exclusive resolution.  Hill
never signed the 2002 DRP.  XBS issued an updated DRP
("2012 DRP").  Following a long course of litigation, XBS
filed a motion to compel individual arbitration by 2,927 class

---

[*] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

members who had signed the 2002 DRP.  The district court found that XBS had waived its right to compel arbitration.

The panel noted that following *Morgan v. Sundance*, 142 S. Ct. 1708 (2022), this Circuit's test for waiver of the right to compel arbitration consists of two elements: (1) knowledge of an existing right to compel arbitration; and (2) intentional acts inconsistent with that existing right.  XBS challenged both prongs of the test.

XBS argued that until after class certification had been granted, and completion of the notice and opt-out period, there was no existing right to compel arbitration.  XBS maintained that it lacked knowledge of an existing right to compel arbitration, and therefore it could not be charged with waiver of a non-existent right.  The panel held that XBS was correct that the district court could not compel nonparties to the case to arbitrate until after a class had been certified and the notice and opt-out period were complete.  However, XBS failed to appreciate that waiver was a unilateral concept.  A finding of waiver by XBS looked only to the acts of XBS, and bound only XBS.  Explicit relinquishment is not the only way to waive a right to arbitrate. The panel held that further undercutting XBS's position was its own actions throughout the course of the litigation, in which XBS raised the 2012 DRP as to putative class members before the class had been certified and before it had the ability to move to enforce that agreement against them.  The panel concluded that it was clear that XBS had knowledge of and knew how to assert its right to compel arbitration under the 2012 DRP well before class certification and notice was complete.  XBS similarly possessed knowledge of the right to compel arbitration as against the signatories of the 2002 DRP sufficient to satisfy the first prong of the waiver test.

Concerning the second prong of the test for arbitration waiver – acts inconsistent with the right to arbitrate – the panel considered the totality of the parties' actions. The panel held that here, there was little doubt that XBS acted inconsistently with its right to compel arbitration under the 2002 DRP. First, XBS many times explicitly asserted as a ground for obligatory arbitration the 2012 DRP without asserting the same for the 2002 DRP. Second, XBS further sought to take advantage of litigation in federal court by requesting extensive discovery on unnamed parties to the case—discovery which necessarily included signatories to the 2002 DRP. That Hill may not have been directly prejudiced by XBS's requests concerning 2002 DRP signatories was immaterial after *Morgan*. XBS's discovery behavior further substantiates the inferences drawn from the record suggesting that XBS was more interested in resolving this litigation, which included the 2002 DRP signatories' claims, in court rather than in arbitration. Third, XBS actively litigated this case through filing a motion for partial summary judgment on the issue whether unnamed class members subject to XBS's ABC pay scheme were "piecemeal" workers under Washington's Minimum Wage Act. The panel rejected XBS's argument that the language in the class notice itself demonstrated that it had not acted inconsistently with respect to the 2002 signatories. Considering the totality of the circumstances, the panel concluded that the district court properly found that XBS acted inconsistently with its right to compel arbitration under the 2002 DRP.

Finally, the panel rejected XBS's contentions that it would have been futile for it to have filed a motion to compel arbitration sooner than it did, and that, accordingly, its otherwise clear waiver of the right to compel arbitration

should be excused.  First, XBS argued that it would have been futile to file a motion to compel arbitration until after class certification because only then would unnamed class members be brought into the case, and only then would the district court have jurisdiction over those individuals.  The panel held that waiver did not require a court to have jurisdiction over the beneficiaries of the waiver, it did not even require a lawsuit to have been filed.  Second, XBS argued that it would have been futile to compel arbitration under the 2002 DRP before the Supreme Court decided *Lamps Plus v. Varela*, 139 S. Ct. 1407 (2019), because before *Lamps Plus*, it would not have been guaranteed individual arbitration under the 2002 DRP.  The panel held that regardless whether arbitration were to be conducted individually or as a class, XBS would have had a valid right to compel arbitration under the 2002 DRP.  In addition, XBS could not rely on *Lamps Plus* as establishing any new law with respect to arbitration agreements that are silent regarding class arbitration because that issue was decided nearly a decade earlier *by Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662 (2010).  The panel concluded that it would not have been futile for XBS to assert the 2002 DRP throughout the course of the litigation below in the same manner as it did the 2012 DRP.

Judge VanDyke dissented.  He wrote that under this court's precedents, a defendant may waive a right to compel arbitration only by intentionally relinquishing it.  That intention can be express or implied, but this court has refused to find implied waiver unless a defendant completes concrete acts inconsistent with the right to arbitrate.  Here, XBS never took a single act inconsistent with its intent to arbitrate the claims of its call-center employees who had signed arbitration agreements, and this fact alone should end the

analysis in this case. In addition, XBS advised named plaintiff Hill and the district court of its intent to compel arbitration against those employees should the putative class be defined to include them. During the extended litigation against Hill, XBS took no action that uniquely targeted class members and not Hill. Finally, XBS moved to compel arbitration against every class member with whom it had an arbitration agreement on literally the first day after it could do so.

Judge VanDyke wrote further that the majority avoids the outcome these facts require by transforming this court's clear waiver rule into an opaque forfeiture rule. This break from precedent is premised on the majority's misunderstanding of how much it may rely on its own preferences and instincts instead of on concrete acts to find waiver. None of the three purported "acts" of XBS the majority points to supports a conclusion of waiver because each "act" intentionally related to Hill, with whom XBS had no right to arbitrate. Further, the majority's new forfeiture rule fails even on its own terms. XBS did nothing in this case to evince that it affirmatively intended to waive its right to arbitrate—it merely litigated against the named plaintiff Hill and opposed her attempts to certify a class. That should not be enough to intentionally waive a merits defense wholly inapplicable to the named plaintiff.

**COUNSEL**

Todd L. Nunn (argued), Daniel P. Hurley, Ryan D. Redekopp, and Patrick M. Madden, K&L Gates LLP, Seattle, Washington, for Defendants-Appellants.

Daniel F. Johnson (argued), Breskin Johnson & Townsend PLLC, Seattle, Washington; Toby J. Marshall, Terrell Marshall Law Group PLLC, Seattle, Washington; for Plaintiff-Appellee.

**OPINION**

BEA, Circuit Judge:

We are called on to decide whether the district court correctly determined that the actions of Appellant Xerox Business Services, LLC constituted a waiver of its right to compel arbitration as against unnamed parties to the class action below.  The Supreme Court's recent decision in *Morgan v. Sundance*, 142 S. Ct. 1708 (2022), has removed prejudice to the non-moving party as an element of waiver in the context of arbitration contracts.  Accordingly, we take occasion to restate this Circuit's rule of waiver of the right to arbitrate, which is nothing more than the general rule of waiver of a contractual right: a party waives its right to compel arbitration when (1) it has knowledge of the right, and (2) it acts inconsistently with that right.  Moreover, the body of caselaw in this Circuit applying these two elements remains good law following *Morgan*, which by its own terms decided only "a single issue" and held that federal courts cannot "condition a waiver of the right to arbitrate on a

showing of prejudice." *Morgan*, 142 S. Ct. at 1712–13. Thus, relying on established Ninth Circuit precedent, we affirm the district court's order which denied Appellant's motion to compel arbitration.

## I. BACKGROUND

Appellant Xerox Business Services, LLC ("XBS") operated call centers in Washington State and elsewhere that responded to customer calls on behalf of third-party clients such as phone companies, airlines, and hotels.[1]    XBS compensated its call center agents according to a proprietary system of differential pay rates known as Achievement Based Compensation ("ABC").  Under the ABC plan, XBS agents received different rates of pay for each task performed.  "Productive" tasks (*e.g.*, handling incoming calls for clients) were compensated at a variable per minute rate that trended higher or lower based on customer satisfaction and efficiency metrics.  "Non-productive" tasks (*e.g.*, waiting for calls) were not independently compensated.  "Additional Pay" compensated employees at minimum wage for mandatory activities such as trainings and meetings.  XBS totaled "productive" and "non-productive" minutes at the end of the week to determine an employee's "ABC Pay" and offered "Subsidy Pay" when necessary to ensure an employee's overall hourly pay rate met or exceeded Washington's minimum wage.[2]

---

[1] Defendant Affiliated Computer Services, Inc. ("ACS") became defendant Affiliated Computer Services, LLC, which became XBS. Defendant LiveBridge, Inc. was a wholly owned subsidiary of XBS. Collectively, we refer to all defendants as "XBS."

[2] To illustrate: In 2012, Washington's minimum wage was $9.04 per

Beginning in 2002, most, but not all, XBS call center agents signed the company's Dispute Resolution Plan ("2002 DRP"). Section 4 of the 2002 DRP required XBS and its agents to submit "All Disputes" to binding arbitration for final and exclusive resolution.[3] "Disputes" included "all legal and equitable claims, demands, and controversies, of whatever nature or kind, whether in contract, tort, under statute or regulation, or some other law."

## A. Initiation of the Suit

Appellee Tiffany Hill worked at an XBS call center under an ABC compensation plan from September 2011 until April 2012. All agree that Hill never signed the 2002 DRP and never agreed to submit disputes with XBS to arbitration or to waive her right to bring claims against XBS in court.

On April 24, 2012, Hill brought Washington state law employment compensation claims against XBS based on diversity jurisdiction in the U.S. District Court for the Western District of Washington on behalf of herself and a putative class of current and former call center agents

---

hour. Under the ABC plan for that year, agents earned $9.04 per hour in "Additional Pay" for trainings, meetings, and breaks and $0.15 to $0.25 per minute in "ABC Pay" ("productive" work less "non-productive" work). That means an agent who attended one half-hour meeting ($9.04 per hour), took a half-hour lunch ($9.04 per hour), managed calls at an average quality for six hours ($0.20 per minute / $12.00 per hour), and was non-productive for one hour ($0.00 per hour) would earn an average wage of $10.13 per hour and receive no "Subsidy Pay."

[3] Section 4 of the 2002 DRP provides:

> All Disputes not otherwise settled by the Parties shall be finally and conclusively resolved under this Plan and the Rules, by binding arbitration.

compensated under the ABC plan.  Hill made minor changes in a first amended complaint filed several weeks later.  On June 1, 2012, in its answer to the first amended complaint, XBS denied the allegations of the amended complaint and asserted several affirmative defenses against all of Hill's claims, one of which is relevant here: "Failure to exhaust administrative and contractual remedies."

In September 2012, and perhaps independent of this litigation, XBS issued an updated DRP ("2012 DRP").  The 2012 DRP provides that "each Dispute . . . shall be arbitrated on an individual basis" and barred the initiation of or participation in "a class, collective, consolidated or representative Dispute."[4]

On January 22, 2013, Hill filed her operative second amended complaint.  Hill asserted six claims against XBS for allegedly violating Washington's state law wage,

---

[4] Section 4(c)(i) of the 2012 DRP provides in full:

> To the extent allowed under the law, each Dispute not otherwise resolved by the Parties shall be arbitrated on an individual basis.  Except for Disputes asserted by named plaintiffs or putative plaintiffs in a class, collective, consolidated or representative action pending in court before the Effective Date, neither an Employee nor the Company may initiate or participate in a Dispute on a class, collective, or consolidated basis, or in a representative capacity on behalf of other persons or entities that are claimed to be similarly situated.  An Applicant may not participate in a class, collective, consolidated or representative Dispute that has been filed against the Company before the Applicant's first day of employment.  The arbitrator shall have no authority to arbitrate a Dispute as a consolidated class, collective or representative action.

overtime, and consumer protection provisions by underpaying agents for ordinary work and refusing to compensate agents for "off the clock" work completed prior to scheduled shifts. Hill proposed a class of all current and former XBS agents who worked at XBS call centers in Washington "between June 5, 2010 and the date of final disposition of this action." To remedy the alleged violations on behalf of herself and the putative class, Hill sought a declaratory judgment, compensatory and exemplary damages, and attorneys' fees and costs.

On February 6, 2013, in its answer to the second amended complaint, XBS denied its allegations and renewed its contractual affirmative defenses, now specifically identifying the 2012 DRP, which unlike the 2002 DRP expressly barred class-wide litigation of any claims: "Failure to exhaust administrative and contractual remedies. More specifically, some members of the alleged Putative Class are subject to individual arbitration agreements that require arbitration of their claims and expressly prohibit their participation in class action litigation." XBS did not explicitly assert any similar matter, or indeed mention, the 2002 DRP in its answer.

On June 17, 2013, XBS responded to Hill's discovery requests and produced both the 2002 DRP and the 2012 DRP. Approximately one month later, XBS sent discovery requests to Hill's counsel, which included requests for production of documentation related to the putative class members referenced in Hill's complaint as well as any other information that Hill had regarding the claims of those class members. Notably, XBS again mentioned only the 2012 DRP—it defined the putative class as the individuals that Hill purported to represent except for the 2012 DRP signatories, which XBS noted were "bar[red from] . . .

participati[ng] in th[e] litigation" by the arbitration agreement. Despite having produced the 2002 DRP several weeks earlier pursuant to plaintiff's discovery request, XBS failed to suggest a similar defense or even to mention that agreement in these requests.

On October 16, 2013, Hill filed a motion for class certification under Federal Rule of Civil Procedure 23(a) and (b)(3). On November 18, 2013, XBS opposed certification on various grounds, which included arguing that Hill's claims were not typical of the class claims because Hill "d[id] not face defenses that other agents face" and that "agents hired after September 27, 2012, are subject to binding individual arbitration."[5] Unlike its citation of the 2012 arbitration agreement, XBS made no explicit mention of the 2002 DRP and continued to treat those who had signed the 2002 agreement as a part of the putative class XBS opposed. XBS argued that the claims of the putative class, including those of the 2002 DRP signatories, were not fit for class-wide resolution only because there were factual issues in calculating individual damages that would predominate over any common questions of fact or law. In fact, XBS spent a significant portion of its briefing in opposition to class certification attacking the merits of the class's claims by contending that under its interpretation of Washington's Minimum Wage Act ("MWA"), Hill and all other class members that she purported to represent, including the 2002 DRP signatories, lacked a meritorious cause of action in the first place. XBS's opposition included a notation that XBS

---

[5] In her reply brief in support of her motion for class certification, filed on December 16, 2013, Hill conceded that "agents who started after September 27, 2012 *and* signed an individual arbitration agreement are excluded from the class." (emphasis in original).

intended to file a summary judgment motion on this interpretive theory that no class member had a meritorious cause of action shortly thereafter.

As previewed in its opposition to class certification, on November 27, 2013, XBS did file a motion for partial summary judgment on the merits of Hill's claims, in which it argued that Hill, and the putative class members, had received all the compensation to which she, and they, were entitled under the MWA as a "piecemeal" worker. Importantly, XBS noted that it was moving for summary judgment primarily because it wanted to resolve the central legal questions raised by the claims that Hill asserted for herself and on behalf of the putative class members, which included the 2002 DRP signatories, because "early summary judgment [could] obviate the need for certification."  And XBS made clear in its briefing that it understood that its motion was aimed at obtaining a judicial resolution of the legal merits underlying all class members' claims beyond those that were personal to Hill, which claims included those of the putative class members who were signatories of the 2002 DRP.  For example, XBS expressly stated that certain legal arguments that it contended were meritless were raised by "[c]lass counsel" and were "not advanced by Hill" because they did not apply to her claims specifically. Furthermore, in its summary judgment briefing, XBS made frequent reference to the arguments that "class counsel" had raised in support of *the certification motion*, which certification arguments XBS sought to rebut by contending that neither Hill *nor* the putative class members were injured because XBS believed that they were properly compensated

for their work.[6]

On July 10, 2014, the district court denied XBS's motion for partial summary judgment and granted Hill's motion to certify a class of current and former XBS call center agents compensated under the ABC plan ("the ABC Class") pursuant to Rule 23(b)(3). The district court accepted Hill's concession that agents who signed the 2012 DRP "will be prevented from participating in this class action" but rejected XBS's argument "that this [wa]s a significant enough number of agents to preclude certification on the basis that Ms. Hill is atypical." The district court found common issues predominated over individual ones because each class member's claim turned on whether the ABC plan violated the MWA.[7] However, the court refused to provide a fulsome

---

[6] Moreover, even Hill and her counsel understood XBS's arguments to apply more broadly than Hill's personal claims of underpayment because Hill's response in opposition to the summary judgment motion framed XBS's arguments as follows:

> Defendants contend that they have no obligation to pay Ms. Hill *and other call center agents* the minimum wage for each hour worked because the agents are 'pieceworkers.' There is no genuine dispute that Xerox pays its Washington employees by the hour and by the minute, not by the 'piece' or unit of work. Thus, Defendants' Federal Way *call center agents*, including Ms. Hill, are hourly workers. (emphasis added).

And, in its reply brief in support of its summary judgment motion, XBS embraced this focus on the claims of underpayment made by *all* putative class members, including the 2002 DRP signatories, by consistently referring to the payment that all call center "agents" received.

[7] The district court denied class certification as to Hill's "off the clock"

definition of the scope of the ABC Class until the parties submitted additional briefing on the effective date of the related *Sump* class arbitration settlement, which covered similar state law claims brought by a similar class of XBS call center agents.[8]

On July 24, 2014, following the district court's ruling provisionally certifying the class, XBS filed a Motion for

_____

and consumer protection claims after concluding that common issues did not predominate over individual factual questions. In contrast to the ABC plan, XBS lacked a centralized corporate policy regarding pre-shift expectations and the contents of call center job advertisements.

[8] The *Sump* class arbitration settlement relates to a proposed class action filed on July 17, 2008, against Affiliated Computer Services, a Defendant in this matter. *Sump v. Affiliated Computer Servs.*, No. 08-2-21283-1 (King Cnty. Sup. Ct.); Case No. 2-08-cv-1082 (W.D. Wash.); Case No. 116007354 (JAMS). Notably, all plaintiffs in *Sump* were compelled to arbitrate under the 2002 DRP. *See Sump v. Affiliated Computer Servs.*, No. 08-2-21283-1 (King Cnty. Sup. Ct.), Order Grant'g Mot. Compel Arbit. & Dismiss Without Prejud., Dkt. No. 17A (filed Sept. 11, 2008) ("The parties are hereby ORDERED to submit all claims alleged in this action to arbitration in accordance with the terms of [the 2002 DRP] each plaintiff entered with Defendants and as Plaintiffs have agreed to do [in their Response to Defendants' Motion to Compel Arbitration and Dismiss found at Dkt. No. 17]."); *see also id.*, Pls.' Resp. Defs.' Mot. Compel Arbit. & Dismiss, Dkt. No. 17 (filed Sept. 8, 2008) ("Plaintiffs each agreed to submit any claims concerning their employment to binding arbitration, pursuant to a very detailed 'Dispute Resolution Plan' [] promulgated in 2002. . . . [H]aving reviewed the documents[,] . . . Plaintiffs have agreed to submit their claims to arbitration pursuant to the Defendants' plan."). Notably, the commencement of the *Sump* action occurred well before Hill filed her complaint in this case, and XBS availed itself of its right to compel arbitration under the 2002 DRP in *Sump* before it filed its answers in this case. Of note, named plaintiff Mary Sump (of *Sump*) had signed the 2002 DRP, in contrast to named plaintiff Tiffany Hill here, who signed no arbitration agreement whatsoever.

Reconsideration which, in relevant part, asked for the court to reconsider its denial of XBS's summary judgment motion and its rulings about predominance. XBS argued that reconsideration was proper because the district court's denial of its summary judgment motion was manifestly erroneous in failing to adopt XBS's characterization of the ABC Plan as a piecemeal payment plan and by failing to credit its interpretation of the MWA, which XBS believed would permit the "agents" to receive "a windfall" in compensation. In addition, XBS moved to have the district court reconsider its grant of Hill's motion for class certification by again contending that the factual issues of calculating damages for the provisional class members, which at the time covered the 2002 DRP signatories, trumped the benefit of class-wide resolution. As was the common theme during its early motions practice before the district court, at no point in its briefing did XBS identify the fact that many of the members of the provisionally certified class were subject to the 2002 DRP and could not be parties to the class action as a result. This particular omission is especially notable because it occurred immediately following the district court's certification decision, which decision evinced the district court's willingness to protect XBS's arbitration rights by actively excluding the 2012 DRP signatories from the provisionally certified class. Thus, despite the fact that XBS had a clear opportunity to raise the 2002 DRP signatories and to challenge their inclusion in the class definition, XBS instead opted to request that the district court reconsider its *substantive* ruling on XBS's summary judgment motion regarding the legal merits of the class members' claims of underpayment, which claims included those of the 2002 DRP signatories. As XBS made this substantive argument as a direct response to the district

court's provisional certification of a class of XBS employees, XBS evinced a strong desire to obtain a judicial resolution of the merits of its challenge that would apply not only to Hill but also to all provisional class members, which still included the 2002 DRP signatories.

In the same filing, on July 24, 2014, XBS moved in the alternative to have the district court amend its order to certify the summary judgment ruling for interlocutory appeal. XBS sought to pursue a *judicial* resolution of what it termed the "threshold issue" of whether or not the ABC Plan, which covered the entire provisional class including the 2002 DRP signatories, was a piece rate rather than an hourly compensation system, which would have effectively rendered meritless the class claims about underpayment, including those of the 2002 DRP signatories. As XBS explained, this interlocutory appeal was necessary because if the court's "denial of summary judgment [were] reversed, the threshold legal issue in the case [would] be[] resolved, [which would] spar[e] the parties the expensive process of addressing class certification issues, possibly serving notice on class members, engaging in additional discovery, and trying the case."

On September 18, 2014, the court denied XBS's motion for reconsideration and noted that it was not going to reevaluate its "Rule 23(b)(3) [decision] because [XBS] point[ed] to *no new arguments*" as to why class certification was improper—arguments which could have included XBS's arbitration rights under the 2002 DRP. Thus, the district court left its provisional class certification decision in place. But the district court did agree with XBS's argument in the alternative and certified the portion of its order denying XBS's summary judgment motion for interlocutory appeal under 28 U.S.C. § 1292(b), so that XBS

could pursue its legal theory that the call center agents were paid according to a piecework rather than hourly plan under the MWA.  Subsequently, the district court entered a stay pending resolution of the interlocutory appeal.[9]

This Court began those proceedings on December 3, 2014, and ultimately certified the question to the Washington Supreme Court; adopted that court's decision that call center agents are hourly workers protected under the MWA; and affirmed the district court's denial of summary judgment. *Hill v. Xerox Bus. Servs., LLC*, 868 F.3d 758, 763 (9th Cir. 2017) ("*Hill I*") (certifying question); 426 P.3d 703, 708–09 (Wash. 2018) (answering certified question); 771 F. App'x 771, 772 (9th Cir. 2019) ("*Hill II*") (affirming and remanding) (mem).[10]   On July 3, 2019, the final mandate

---

[9]   Notably, in support of its motion to stay pending appeal, XBS reiterated its position that the interlocutory appeal would obviate much of the class related work because it would result in a *judicial* resolution of the merits of a "threshold legal issue" that affected all class members, including the 2002 DRP signatories.

[10] Although the Washington Supreme Court held that the ABC Plan was not a piecework plan, which under the certification order required this Court to affirm the district court's summary judgment decision, XBS submitted a letter brief to this Court arguing that there was still an open question about the proper classification of its ABC plan system. *Hill v. Xerox Bus. Servs., LLC*, No. 14-36029 (9th Cir.), Letter Br., Dkt. No. 61 (filed Dec. 28, 2018).  Thus, even after XBS lost in the Washington Supreme Court, its letter brief evinced a continued desire for a judicial resolution of the merits of this question, which resolution would govern the claims of everyone in the provisionally certified class, including the 2002 DRP signatories.  And XBS knew that it was seeking a judicial resolution of the merits of these claims because it requested that this Court "hold [that] the ABC plan is not an hourly plan," which XBS argued would require "vacat[ing] the district court's order denying partial summary judgment" because that holding meant the ABC plan's

from this Court issued with respect to those matters, and on July 16, 2019, the district court lifted the stay and instructed the parties to file a joint status report. From the moment that the provisional class was certified on July 10, 2014, until the stay was lifted on July 16, 2019, over five years had elapsed, during which time XBS pursued a judicial resolution of the merits of the central legal issue that undergirded the claims of Hill and all the putative class members, including the 2002 DRP signatories.[11]

## B. Notice to Arbitrate Under the 2002 DRP

After the stay was lifted, Hill filed a Motion to Define Scope on July 18, 2019, which requested that the district court define the scope of the certified ABC Class to include signatories to the 2012 DRP, notwithstanding her previous concession that such signatories be excluded from the class. On July 26, 2019, the parties filed a Joint Status Report in

---

"other-than-hourly pay [structure] complied with Washington law." *Id.* at 7.

[11] While the dissent briefly acknowledges this six-year detour that XBS made focused on its legal interpretation of the MWA to defeat the claims of all members of the class, including the signatories of the 2002 DRP, it attempts to downplay its relevance. Dissent at 58–59, 76–77. Contrary to the dissent's characterization, XBS's multi-year focus on the merits of the claims that it actively understood to apply to Hill's claims as well as the claims of the 2002 DRP signatories creates a strong inference that XBS wanted a *judicial* resolution on the merits and chose to use the arbitration forum instead as a backup in the event that its summary judgment expedition failed. Under caselaw, we will not reward XBS's attempt to take a second bite from the apple in this manner. *In Re Mirant Corp. v. Castex Energy, Inc.*, 613 F.3d 584, 590 (5th Cir. 2010) (explaining that the waiver rule is in place to prevent litigants from "delay[ing] moving to compel arbitration until they could ascertain how the case was going in federal district court." (internal quotations omitted)).

which XBS stated its position that "the 2012 and 2002 DRP need to be specifically addressed prior to finalizing the class" and that "these issues should be briefed and considered on class certification. If individuals subject to arbitration agreements are included in the class, Defendants anticipate bringing motions to compel individual arbitration once the class is finalized." Notably, over six years after XBS had last referenced the 2002 DRP on June 17, 2013, when it produced the agreement in response to Hill's discovery request, XBS's statement in the Joint Status Report was the first time in this case that XBS had explicitly expressed its intent to compel arbitration under the 2002 DRP in this action—let alone even mention the 2002 DRP—notwithstanding its actions in the earlier *Sump* action.[12]

On August 5, 2019, in its Response to Hill's Motion to Define Scope, XBS urged the district court to "find that individual arbitration agreements preclude class certification altogether." XBS again argued that arbitration agreements under both the 2002 and the 2012 DRP barred the participation of many putative class members:

> A vast number of putative class members are parties to arbitration agreements with

---

[12] The dissent contends that the record reveals over a dozen times that XBS has referenced the 2002 DRP during the course of the litigation. Dissent at 74. The dissent omits the fact that all but two of the record cites occurred in 2019 after XBS's six-year gamble with its summary judgment merits appeal failed to produce fruit. Furthermore, its two other mentions of the 2002 DRP involved (1) XBS's answer to Hill's first, and now inoperative, complaint, which was filed before the 2012 DRP was even drafted, and (2) XBS's production of the 2002 DRP in 2013, which simply lends credence to the fact that XBS knew of its arbitration right.

Defendants (ACS, XBS, or their successors), either the version from 2012 (with a class action waiver) or the one from 2002 (which was silent as to class actions). The 2002 DRP is enforceable for class members once the class is certified based on *Lamps Plus, Inc. v. Varela*, 129 S. Ct. 1407 (2019).

On August 13, 2019, the district court issued an order defining the scope of the ABC Class. Specifically, the district court defined the ABC class as follows:

All persons who have worked at Defendants' Washington call centers under an "Activity Based Compensation" or "ABC" plan that paid "per minute" rates for certain work activities between June 5, 2010, and the date of final disposition of this action.

However, excluded from this class were the signatories to the 2012 DRP:

In addition, the following exclusion will apply to the ABC class: "Any employees who were hired after September 27, 2012 and who signed arbitration agreements as part of Defendants' revised 2012 Dispute Resolution Program."

Notably, the court did not address XBS's arguments

about the 2002 DRP.[13]

Thereafter, and in light of the district court's class certification order, Hill and XBS worked together to develop a final list of 5,772 class members for the purposes of notice under Rule 23(c)(2)(B).   XBS acknowledged that its preparation of this list involved frequent conferrals with Hill's counsel as well as some discovery on the class members, including the 2002 DRP.  During this process, on September 20, 2019, XBS explained to Hill that it had

> included individuals in the class list whose claims (we believe) are barred because … they signed earlier arbitration agreements that (under the Supreme Court's *Lamps Plus* decision) require individual arbitration. Although we believe it would be more efficient to remove those individuals before notice is sent, we left them in the preliminary class list at this time.

And on November 13, 2019, while explaining to the district court how the class list was populated, XBS

---

[13] Despite explaining in its response to Hill's 2019 motion to define the scope of the class that it believed that class certification could be defeated by both the 2012 DRP and the 2002 DRP, and despite having represented in the Joint Status Report that it planned on "filing its own motion regarding class certification issues," which necessarily implicated its argument that "[a] certified class cannot include class members who entered into arbitration agreements," XBS never filed such a motion nor did it move the district court to amend its certification order to remove the 2002 DRP signatories from the certified class, despite the court's evincing its willingness to exclude individuals subject to arbitration agreements by excluding the 2012 DRP signatories.

reiterated its position that although the signatories under the 2002 DRP were included in the class list, XBS anticipated moving to compel arbitration against them after the notice and opt out time window had run.

Hill's counsel moved forward with a joint motion to distribute notice and set an opt out schedule, which the district court approved on December 17, 2019. As is relevant here, the class notice explained that class members' rights would be adjudicated unless they opted out and further stated that employees who had signed the 2012 DRP were excluded from the class. The class notice also noted that XBS had raised defenses to the claims asserted, including "that other Class Members are required to pursue their claims through individual arbitration." The notice administrator reported on March 4, 2020, that the class had only one opt out and officially contained 5,771 members.

In the intervening time between the district court's certification order and the finalization of the class, XBS continued to engage in standard litigation practice. It participated in a status conference with Hill's counsel and the district court judge, in which it failed to mention the 2002 DRP (a fact XBS does not dispute). And it stipulated to a proposed case schedule organizing proceedings regarding discovery, summary judgment, and trial without reference to the arbitration agreements or a future motion to compel arbitration against the absent class members. XBS and Hill engaged in discovery during which time the parties' damages experts submitted reports and discussed the proper method for calculating overtime pay.[14]

---

[14] The dissent picks up on XBS's counsel declaration that claims that

The day after the notice administrator gave his report on the final class size, on March 5, 2020, XBS filed a motion to compel individual arbitration by 2,927 class members who had signed the 2002 DRP. XBS argued that it was able to identify individual class members and their associated DRP records only after the finalization of the class definition in August 2019. XBS further argued that it had lacked the ability to compel arbitration by these class members until the notice administrator's report confirmed the finality of the class. Hill conceded that the 2,927 class members in question signed the 2002 DRP and that the 2002 DRP is enforceable if not waived. However, Hill argued that XBS had waived its right to arbitrate by moving to compel arbitration too late in the litigation. The district court agreed and found that XBS had waived its right to compel arbitration. XBS timely appealed.

---

any discovery regarding the 2002 DRP signatories was quite limited. Dissent at 68. This contrasts with Hill's representation that discovery was "extensive." While the extent of the actual discovery that occurred post-certification is unclear, the conception that the discovery that did occur between the class certification and filing of XBS's motion to compel was quite limited—which is the impression left by the declaration of XBS's counsel—is belied by the record itself. The emails and excel workbooks discussed in Hill's damages expert's report regarding the purported underpayment of class members' wages suggests that XBS was actively involved in discovery during this time frame. It shared payroll data with Hill via several large excel workbooks, explained the workbooks in an email thread dated January 10, 2020, and engaged a rebuttal expert of its own to publish a report on February 24, 2020, which challenged Hill's expert's calculations. These exchanges and the reports themselves evince XBS's engagement in discovery as to the class members, including the 2002 DRP signatories, during the notice and opt-out period on the merits of their claims to underpayment that is more involved than XBS's or the dissent's characterization makes out.

## II. STANDARD OF REVIEW

We have jurisdiction under 28 U.S.C. § 1291 as "a district court's denial of a motion to compel arbitration is a final order appealable under the Federal Arbitration Act, 9 U.S.C. § 16(a)(1)(B). We review de novo the district court's denial of a motion to compel arbitration, including its determination that a party has waived the right to arbitrate." *Newirth by & through Newirth v. Aegis Senior Communities, LLC*, 931 F.3d 935, 939 (9th Cir. 2019) (cleaned up).

## III. ANALYSIS

Previously, this Circuit's arbitration waiver test was grounded in *Fisher v. A.G. Becker Paribas Inc.*, 791 F.2d 691 (9th Cir. 1986), which required the following: "(1) knowledge of an existing right to compel arbitration; (2) intentional acts inconsistent with that existing right; and (3) prejudice to the person opposing arbitration from such inconsistent acts." *Newirth*, 931 F.3d at 940 (citing *Fisher*, 791 F.2d at 694). As noted above, however, *Morgan* has eliminated the prejudice requirement as an element from any arbitration waiver test. Now, the test for waiver of the right to compel arbitration consists of two elements: (1) knowledge of an existing right to compel arbitration; and (2) intentional acts inconsistent with that existing right. XBS challenges both prongs of the above test by asserting that it neither had knowledge of an existing right to compel arbitration under the 2002 DRP, nor performed any acts inconsistent with its right to compel arbitration under the 2002 DRP.

### A. Knowledge of an existing right to compel arbitration

Here, XBS argues that until after class certification had been granted, followed by the completion of the notice and

opt-out period, "there was no existing right to compel arbitration because XBS could not move to compel arbitration against either Hill or putative class members." Accordingly, XBS maintains that it lacked knowledge of an existing right to compel arbitration and, therefore, that it cannot be charged with waiver of a non-existent right.

In one rather limited sense, XBS is correct—the district court could not compel nonparties to the case to arbitrate until after a class had been certified and the notice and opt-out period were complete. *In re JPMorgan Chase & Co.*, 916 F.3d 494, 503 n.19 (5th Cir. 2019) (observing that "courts cannot compel individuals to arbitrate when they are yet to be identified and have not joined the suit."); *see also Gutierrez v. Wells Fargo Bank NA*, 889 F.3d 1230, 1238 (11th Cir. 2018). However, what XBS fails to appreciate is that waiver is a unilateral concept. A finding of waiver by XBS looks only to the acts of XBS, binds only XBS, does not reach out to affect the rights of as then-unnamed class members, and does not depend upon when the law requires or authorizes such a right to be asserted. As noted by the Supreme Court in *Morgan*, "[t]o decide whether a waiver has occurred, the court focuses on the actions of the person who held the right; the court seldom considers the effects of those actions on the opposing party." 142 S. Ct. at 1713; *see also Royal Air Props., Inc. v. Smith*, 333 F.2d 568, 571 (9th Cir. 1964) ("But no detriment to a third party is required for waiver, it is unilaterally accomplished.").

Moreover, we have never suggested that for waiver purposes, knowledge of an existing right to arbitrate requires a present ability to move to enforce an arbitration agreement. *Cf. In re Cox Enterps., Inc. Set-top Cable Television Box Antitrust Litig.*, 790 F.3d 1112, 1119 (10th Cir. 2015) (declining to adopt a rule that would deem the "right to

arbitrate against [] class members" as known only after "the class was certified").[15]  On this point, XBS conceded at oral

---

[15]  While contending that it is not doing so, Dissent at 80–81, the dissent disagrees with this principle and embraces XBS's theory that a party needs to have present authority to vindicate that right for the party to be able to take actions inconsistent with an existing right.  Dissent at 57–58, 65–68, 66 n.1, 75.  As the dissent frames it, our opinion errs because "[o]nly" a defendant who is actively litigating against class members subject to arbitration that are *joined* to the lawsuit "can be said to have acted consistent with an intent to waive its right to arbitrate."  Dissent at 64.  But in making this assertion, the dissent fails to cite any authority or to provide any explanation for this rule that underpins its entire analysis.  Nor could it.

To begin with, what the dissent suggests is plainly a forfeiture argument: a party cannot forfeit what is not available because it never would have had an opportunity to raise that right in the first instance—hence the forfeiture caselaw's focus on whether an issue was "timely assert[ed]." *Crowley v. Epicept Corp.*, 883 F.3d 739, 748 (9th Cir. 2018) (contrasting forfeiture with waiver and explaining that waiver is defined as a party's "intentional[] relinquish[ment] or "abandon[ment]," which does not turn on the timing of when a right is asserted).

But furthermore, this erroneous conflation of waiver and forfeiture runs headlong into centuries of history and common law development regarding inchoate rights.  Inchoate rights are those that a party holds but does not have the present power to vindicate.  Inchoate rights are "incomplete" because further action is needed to crystalize them—or more technically, the additional action enables the rightsholder to perfect the right so that it vests in the owner in its full form.  *E.g.*, 2 William Blackstone, Commentaries *437 (In the case of the common law interest that a party who reported a statutory violation holds in the penalty exacted against the violator, "[h]e obtains an inchoate imperfect degree of property, by commencing his suit; but it is not consummated till judgment." (cleaned up)).  There are many historical examples of rights that the Supreme Court has protected in the rightsholder even though the interest obtained was inchoate.  *E.g.*, *Hendrie v. Dayles*, 98 U.S. (8 Otto) 546 (1878) (enforcing the assignment of an inchoate right to obtain a

argument that a class action defendant could waive the right to arbitrate against *putative* class members by affirmatively renouncing that right. This concession is fatal to XBS's argument because we have never held that *explicit* relinquishment is the only way to waive a right to arbitrate. Indeed, we have stated just the opposite. *Newirth*, 931 F.3d

---

future patent); *Dundas v. Hitchcock*, 53 U.S. (12 How.) 256 (1851) (enforcing a widow's relinquishment of her right to claim a dower from her husband's estate when it was given as consideration for a mortgage during her husband's lifetime, even though the right to a dower estate was inchoate until the husband's death); *Jones v. Shore's Ex'r*, 14 U.S. (1 Wheat.) 462 (1816) (protecting the inchoate rights of a collection officer in the goods seized during a forfeiture action even though the officer died prior to the condemnation judgment that consummated his ownership interest); *The Mary and Susan*, 14 U.S. (1 Wheat.) 46 (1816) (protecting the inchoate right of a captor to a prize in a ship captured during war according to a duly passed statute against subsequent attempts by the executive branch to revoke that statutory power). And we recently concluded that a property owners' inchoate rights in a right of way that had been abandoned by a railroad were not destroyed by the construction of a public highway. *Avista Corp. Inc. v. Wolfe*, 549 F.3d 1239 (9th Cir. 2008).

This unbroken line of cases protecting inchoate rights makes it clear that certain powers inhere in the party that holds such an imperfect right, even without the rightsholder's present authority to vindicate it: he can assign it, disclaim it, or sell it, just to name a few. An easy example will help solidify this point that a right can exist without the contemporaneous power to enforce it. Take a party's contractual right to liquidated damages in the event that his counterparty materially breaches the contract. The right is inchoate because he cannot sue for liquidated damages before the contract is breached. But the fact that the right has not crystalized, does not prevent the rightsholder from being able to waive that right in anticipation of the counterparty's breach—say, by notifying the counterparty that a particular breach will be excused before it occurs. Simply, nothing about the timing of when the right can be protected affects a party's present ability to act inconsistently with it.

at 942 (explaining that a party can impliedly waive its rights through "actions [that] amount to a knowing relinquishment of th[ose] right[s]"); *Van Ness Townhouses v. Mar Indus. Corp.*, 862 F.2d 754, 759 (9th Cir. 1988) (same).

Further undercutting XBS's position is its own actions throughout the course of the litigation, in which XBS raised the 2012 DRP as to putative class members before the class had been certified and before it had the ability to move to enforce that agreement against them.  First, XBS asserted the following as a defense in its answer to Hill's first amended complaint:  "Failure to exhaust administrative and contractual remedies."  XBS then expanded on this defense in its answer to Hill's second amended complaint: "Failure to exhaust administrative and contractual remedies.  More specifically, some members of the alleged Putative Class are subject to individual arbitration agreements that require arbitration of their claims and expressly prohibit their participation in class action litigation."  XBS acknowledges that the above defense from its answer to the first amended complaint *applied to the 2002 DRP*, as the 2012 DRP had not yet been created at the time of that answer.  But XBS concedes that the "individual arbitration agreements" noted in its answer to the second amended complaint referred only to the 2012 DRP, as the 2002 DRP did not expressly prohibit resolution of disputes by class action litigation and because XBS represents that it referenced the 2002 DRP in only two instances prior to the parties' briefing in 2019 regarding the scope of the class: its first answer and its production of the 2002 DRP during discovery.  Moreover, XBS repeatedly asserted its right to individual arbitration under the 2012 DRP, which ultimately led the district court to exclude signatories of the 2012 DRP from the ABC Class.

As to the element of knowledge of a right, it is clear that

XBS had knowledge of and knew how to assert its right to compel arbitration under the 2012 DRP well before class certification and notice was complete. XBS similarly possessed knowledge of the right to compel arbitration as against the signatories of the 2002 DRP sufficient to satisfy the first prong of the waiver test. The district court was correct in so finding.

## B. Acts inconsistent with the right to arbitrate

"There is no concrete test to determine whether a party has engaged in acts inconsistent with its right to arbitrate; rather, we consider the totality of the parties' actions." *Newirth*, 931 F.3d at 941 (quoting *Martin v. Yasuda*, 829 F.3d 1118, 1125 (9th Cir. 2016)) (cleaned up).[16] As we have previously observed:

> We find this element satisfied when a party chooses to delay his right to compel arbitration by actively litigating his case to take advantage of being in federal court. *See Van Ness Townhouses v. Mar Indus. Corp.*,

---

[16] In contrast to the dissent's analysis, our evaluation of XBS's actions during the course of the litigation is in line with the "holistic approach" our caselaw has demanded of us under this prong of the waiver analysis. *Newirth*, 931 F.3d at 941. If each act is reviewed in isolation, as the dissent suggests should be done—even though it denies doing so, Dissent at 76 n.9—then it is easy to construct reasons and justifications for why the individual actions highlighted do not evince the desire of a party to obtain judicial resolution of the issue at hand. But in contrast, evaluating the totality of a party's actions guarantees that ambiguous actions are not explained away when they constitute one facet of a consistent and intentional practice of seeking judicial resolution of key merits issues that is inconsistent with that party's right to have such claims resolved in an arbitration forum.

862 F.3d 754, 756, 759 (9th Cir. 1988) (finding waiver when party answered complaints, moved to dismiss the action, and did not claim a right to arbitration in any of the pleadings); *Kelly v. Pub. Util. Dist. No. 2*, 552 Fed. Appx. 663, 664 (9th Cir. 2014) (finding this element satisfied when the parties "conducted discovery and litigated motions, including a preliminary injunction and a motion to dismiss"). A statement by a party that it has a right to arbitration in pleadings or motions is not enough to defeat a claim of waiver. *See In Re Mirant Corp. v. Castex Energy, Inc.*, 613 F.3d 584, 591 (5th Cir. 2010) ("A party cannot keep its right to demand arbitration in reserve indefinitely while it pursues a decision on the merits before the district court."); *Hooper v. Advance Am., Cash Advance Ctrs. of Missouri, Inc.*, 589 F.3d 917, 923 (8th Cir. 2009) ("A reservation of rights is not an assertion of rights.").

*Martin*, 829 F.3d at 1125 (cleaned up). Our past case of *Van Ness* is instructive. There, we concluded that the defendant acted inconsistently with its right to compel arbitration "when it made an intentional decision to refrain from filing a motion to compel arbitration (because it did not want to sever the arbitrable claims from the nonarbitrable claims)," and kept the arbitrable claims in federal court for two years while seeking merits determinations, which "includ[ed] filing a motion to dismiss for failure to state a claim." *Newirth*, 931 F.3d at 941.

Importantly, we have never held that a party can act inconsistent with its arbitration rights only if the relevant actions are themselves express denials of the right to arbitrate.[17]  *Kelly*, 552 F. App'x at 664.  For example, in *Newirth*, the finding of acts that amounted to waiver included "filing a motion to dismiss [the plaintiff's] arbitrable claims" on a key merits issue, the defendant's "failure to renew it[s motion to compel arbitration] for a year while it sought a determination on the merits,"[18] and its

---

[17] This contrasts with the implicit and erroneous assumption made in the dissent's analysis—despite its protests to the contrary, Dissent at 80–81—that only direct evidence of waiver through an express disdain of the right to arbitrate can constitute acts inconsistent with that right. Dissent at 75 (contending that the acts deemed inconsistent with a party's arbitration rights must be explicitly "directed at the class" members who are bound by the arbitration agreement).  As we explain, our caselaw is replete with examples of waivers that are evidenced by circumstantial evidence of inconsistency (i.e., the inconsistency is implicit).  In fact, of the caselaw that the dissent cites, only one is an implied waiver case that involves a litigant that made an affirmative statement that expressed a preference for the federal courtroom.  Dissent at 67–68 (quoting *Martin*, 829 F.3d at 1122, 1126).  But even *Martin* does not stand for the principle that there must be an *express* disavowal of one's arbitration right to find an implied waiver occurred.  Our Court in *Martin* highlighted all of the acts that were implicitly inconsistent with the defendants' arbitration right, such as filing a motion to dismiss, engaging in discovery, and drafting a joint stipulation to structure the litigation.  829 F.3d at 1126. The panel then mentioned the defendants' counsel's statement that his clients were "better off" in court as mere bolstering evidence that the defendants' active litigation amounted to waiver.  *Id.*  Thus, *Martin* does not alter the general rule that XBS can waive its arbitration right under the 2002 DRP without having expressly rejected that right.

[18] *Newirth*'s express reliance on the defendant's failure to renew its motion to compel arbitration after having filed and withdrawn the motion earlier in the litigation undermines the dissent's characterization of our

failure to "avail itself of local rules that would have allowed it to seek relief from case management and discovery obligations." *Id.* at 942–43.   Similarly, in *Van Ness*, the court highlighted the party's inconsistent behavior with respect to its arbitration right, which was revealed by its "extended silence" and "much-delayed demand for arbitration," both of which can hardly be described as explicit or active litigation choices revealing an express eschewal of the party's arbitration right.   862 F.2d at 759. *Van Ness* instead explains that the inferences drawn from the party's choice to rely on judicial proceedings, such as by filing "pleadings[ and] motions and approving a pre-trial conference order," amount to a waiver, because one cannot claim to be interested in preserving his right to an arbitration

---

opinion as purporting to "crowbar[]" our waiver analysis "into a yawning new forfeiture rule."   Dissent at 81.   This is because this aspect of *Newirth* implies that in certain scenarios, a defendant's neglecting to make certain arguments when viewed against the backdrop of his other actions can actually serve as *circumstantial evidence of an intentional relinquishment*, even if the failure to act is normally associated with forfeiture.   The key is understanding that when engaging in an implied waiver analysis, the omission is viewed through the lens of the defendant's other actions rather than from the perspective of when the law demands that an argument be raised.   This is because waiver turns on how the party itself acted with respect to its rights, while forfeiture depends on when the law dictates that a right be asserted.   *Crowley*, 883 F.3d at 748.   Thus, when we rely on XBS's omissions in this opinion, it is not as if we are holding that XBS or similarly situated defendants need to make affirmative arguments about certain rights or risk losing their defenses.   Rather, we are engaging in a holistic analysis that reveals that XBS's failure to raise certain arguments is one link in a chain of consistent behavior evincing its disinterest in pursuing the 2002 DRP signatories' claims in arbitration—disinterest, that is, that lasted until XBS's motion for summary judgment was determined (and denied) by the ruling of the Washington State Supreme Court.

forum if he instead relies on the *judicial* process. *Id.* Thus, under our implicit waiver analysis, we are tasked with evaluating a party's actions and asking whether those actions, even if seemingly commonplace and not an express disavowal of arbitral forums, evinced the party's partiality for a judicial resolution of the claims.

Here, there can be little doubt that XBS acted inconsistently with its right to compel arbitration under the 2002 DRP. As the detailed factual and procedural history of this case reveals—and as explored further below—XBS exerted a significant amount of energy challenging the merits of the legal theory underlying the claims that Hill raised personally and on behalf of the class members, including the 2002 DRP signatories. And XBS pursued this challenge in three different courtrooms (the district court, this Court, and the Washington Supreme Court), all without even attempting to reserve its arbitration right under the 2002 DRP when it expressly and consistently did so for its arbitration right under the 2012 DRP. While XBS could not actively move to compel arbitration until the moment that it did, the inferences drawn from the record all point towards waiver: namely, XBS embarked on a six-year appellate journey aimed at judicially resolving the *merits*—the legal heart—of the class members' (including class members who had signed the 2002 DRP) claims with full knowledge that their claims were implicated by the appeal to the same extent as were Hill's claims. And XBS evinced this understanding in its own briefing by consistently referring to its call center agents broadly, and by making a distinction between arguments made by "class counsel," which were not applicable to Hill, and those that Hill raised for herself. The litigation history, during which the specific acts we analyze below occurred, tells the story of XBS's tactical choice to

resolve the claims judicially and reveals that XBS belatedly chose to retreat and to claim the benefit of arbitration under the 2002 DRP only once its judicial strategy failed.

First, as previously noted, XBS many times explicitly asserted as a ground for obligatory arbitration the 2012 DRP without also asserting the same for the 2002 DRP and it repeatedly noted that signatories to the 2012 DRP were "subject to binding individual arbitration."  The decision to pursue "binding individual arbitration," where possible, while keeping claims subject to possible group arbitration in federal court with other nonarbitrable claims is similar to the facts of *Van Ness*, where we previously found waiver of the right to arbitrate.  Similarly, in opposing Hill's motion to certify a class, XBS asserted that the 2012 DRP precluded certification for lack of typicality as a basis for denying class certification, without similarly raising the lack of typicality of class members who signed the 2002 DRP.  Our system generally does not permit a party to lie in the weeds without consequences.[19]  And while the two agreements are certainly different contracts, these differences imply that XBS believed it was more strategically advantageous to challenge the merits of the 2002 DRP signatories' claims through its summary judgment motion or by defeating class certification with the individualized damages calculations instead of relying on the arbitration right that it raised only for the 2012 DRP.   On its own, the disparate treatment is not dispositive—nor is it some counting rule as the dissent

---

[19] Indeed, we have previously held that "a party's extended silence and delay in moving for arbitration may indicate a conscious decision to continue to seek judicial judgment on the merits of the arbitrable claims, which would be inconsistent with a right to arbitrate."  *Martin*, 829 F.3d at 1125 (cleaned up).

contends—but instead serves as evidence from which we can infer that XBS wanted the 2002 DRP signatories' claims, unlike the claims of the 2012 DRP signatories, resolved on the merits in court.  When paired with the discovery requests and the summary judgment motion that involved six years of merits litigation, discussed below, this disparate treatment implies that XBS's "extended silence and much-delayed demand for arbitration [under the 2002 DRP] indicates a 'conscious decision to continue to seek judicial judgment on the merits of the arbitrable claims [raised by the 2002 DRP signatories].   This choice was inconsistent with the agreement to arbitrate those claims.'" *Van Ness*, 862 F.2d at 759 (internal alterations omitted).

Second, XBS further sought to take advantage of litigation in federal court by requesting extensive discovery on unnamed parties to the case—discovery which necessarily included signatories to the 2002 DRP.  In its first discovery requests to Hill, XBS defined "Putative Class member" as follows:

> "Putative Class member" means individuals included in the "Class Definition" provided in Plaintiffs Second Amended Class Action Complaint, *with the exception* of any employees of Defendants who were hired since September 2012 and who entered into or are subject to the Xerox Business Services Dispute Resolution Plan and Rules ("DRP") that includes an individual arbitration agreement and class action waiver that bars their participation in this litigation.

(emphasis added).  XBS notably excepted from its discovery

requests signatories to the 2012 DRP, while not excepting the 2002 DRP signatories—thereby requesting that Hill provide extensive information on putative class members such as the 2002 DRP signatories. Among other particulars, XBS requested the following information from Hill:

> **Interrogatory No. 1:** For Plaintiff *and each Putative Class member*, please describe in detail every communication (e.g., the sender, receiver, date, manner, and content of the communication), if any, received by the individual or of which the individual is aware, that required, requested, allowed, suffered, or permitted the individual to work any time that was not properly recorded in Defendants' respective timekeeping systems.

> **Interrogatory No. 2:** For Plaintiff *and each Putative Class member*, please list the precise amount of unrecorded, off-the-clock, or uncompensated work, if any, each individual worked each work week while the individual was employed by one of the Defendants.

> **Interrogatory No. 3:** For Plaintiff *and each Putative Class member*, please state precisely how each weekly amount of unrecorded, off-the-clock, or uncompensated work identified in Interrogatory No. 2, if any, was calculated, specifying the precise amount and timing of any pre-shift, during shift, and post-shift work claimed each day.

\*\*\*

**Request for Production No. 6:** Please produce all documents received by Plaintiff *or any Putative Class member* or of which Plaintiff *or any Putative Class member* is aware that required, requested, allowed, suffered, or permitted them to work any time that was not properly recorded in Defendants' respective timekeeping systems.

\*\*\*

**Request for Production No. 9:** Please produce all journals, diaries, calendars, day planners, schedules (both paper and electronic), logs, and any other document that discusses the activities of Plaintiff *or any Putative Class member* or reflects how they spent their time on any day that they worked for a Defendant from June 5, 2010, to the present, including, but not limited to, any documents or emails that reflect or contain personal notes, thoughts, concerns, understandings, appointments, schedules, social or business engagements, or obligations or expenditures of time.

**Request for Production No. 10:** Please produce all bank records of Plaintiff *or any Putative Class member* that reflect when and/or where expenditures were made covering time periods during which they worked for a Defendant at any time from June

> 5, 2010, to the present, including, but not limited to, all records of ATM transactions and copies of checks for accounts maintained by them, for their benefit, or that they have used.

(emphases added). To be sure, Hill declined to produce any of the requested information, and instead responded to each of these discovery requests the same:

> Plaintiff specifically objects to this request because it seeks Plaintiff's knowledge regarding "Putative Class members" and [information or documents] related to "Putative Class members," which are improper subjects for discovery to class representatives. 3 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 7:8 (4th ed. 2013) ("[T]he extent of the knowledge of the plaintiff of claims of absent class members is irrelevant and an improper subject for discovery.").

However, that Hill may not have been directly prejudiced by XBS's requests concerning 2002 DRP signatories is immaterial after *Morgan*. It is clear from the record that XBS explicitly sought extensive discovery as to 2002 DRP signatories[20]—signatories XBS treated as putative class

---

[20] While the dissent quibbles with our use of the word "extensive" to challenge our treating the discovery requests as evidence of inconsistent acts, Dissent at 68, it fails to dispute that the documentation and details about the class members that XBS expected to receive as a result of these

members—which weighs in favor of a finding that XBS acted inconsistently with its right to compel arbitration under the 2002 DRP.  Again, the discovery requests served on Hill regarding the putative class, which included the 2002 DRP signatories, may not be dispositive.  But they serve as evidence that XBS wanted to challenge judicially the merits of the claims that the putative class members were underpaid[21]—a strategic choice that was revealed by XBS's reliance on the judicial discovery mechanism.  Just as with the disparate treatment between the 2002 DRP and 2012 DRP, this discovery behavior further substantiates the inferences drawn from the record suggesting that XBS was more interested in resolving this litigation, which included the 2002 DRP signatories' claims, *in court* rather than in

---

requests would have been quite expansive.  That Hill ignored them has no bearing on the fact that demanding of Hill all of the details she had on *all putative class members*, such as timekeeping communications, information about the purportedly uncompensated work that was performed, and the precise calculations used to ascertain how much the class was underpaid, amounted to asking that Hill turn over a significant amount of information.  This is on top of XBS's demands for all the time-keeping documents, bank records, and personal logs kept by the putative class members.  Although Hill responded to each request with the same objection, XBS anticipated receiving a considerable amount of documentation relating to the factual basis for all putative class members' claims, including those of the 2002 DRP signatories.  Thus, there is nothing untoward about describing the *requested* discovery on the 2002 DRP signatories as extensive.

[21] Indeed, as highlighted in this case's procedural history, XBS continued to engage in active discovery regarding the 2002 DRP signatories even after it had made express its intention of compelling arbitration under the 2002 DRP after class certification was finalized: XBS produced time sheets and even engaged an expert to produce a report that challenged class counsel's expert's method for calculating how much class members were purportedly underpaid.  *See supra* note 14.

arbitration.

Third, and most clearly, XBS "actively litigated" this case through filing a motion for partial summary judgment on the issue whether unnamed class members subject to XBS's ABC Pay scheme were "piecemeal" workers under the MWA.  If granted, this motion would have defeated a substantial amount of the claims in this case, both as to Hill and as to the signatories of the 2002 DRP.  This motion for partial summary judgment led the district court to certify an interlocutory appeal which XBS pursued for nearly five years.  It is difficult to understate the possible effect of this particular strategy.  Had it been effective, it would have struck an arrow through the heart of all class members' claims, including the claims of the signatories of the 2002 DRP.  And XBS aggressively pursued its interpretive theory, even after the legal argument had failed, *see supra* note 10.  These actions reveal that XBS was determined to foreclose all class claims, including those of class members who had signed the 2002 DRP, by obtaining a favorable *judicial* ruling.  In the motion to dismiss context, we have noted that a party seeking "dismissal with prejudice on a key merits issue that would preclude relief as to one or more of plaintiffs' claims . . . [is] seeking a ruling on the merits." *Martin*, 829 F.3d at 1126 n.4.  Similarly, XBS was "seeking a ruling on the merits" through its motion for partial summary judgment, which ruling would have foreclosed the claims of the entire ABC Class, whether or not the members of the ABC class had signed the DRP agreements of 2012 or 2002.**[22]**

---

[22] Beyond its argument for a bright-line rule that a class action defendant can never waive its right to compel arbitration as against unnamed class

members, XBS presents no reasons explaining why litigating its motion for partial summary judgment is consistent with its right to compel arbitration under the 2002 DRP. A ruling that putative class members were "piecemeal" and not "hourly" workers under Washington's Minimum Wage Act would have denied the claims of all ABC Class members, whether they were signatories to the 2002 DRP, 2012 DRP, or indeed, even non-signatories to either.

The dissent's argument to avoid this result is also unavailing. The dissent claims that in isolation we can understand the summary judgment motion as being directed only at Hill and her claims and therefore we should not credit this as an inconsistent act. Dissent at 65–66, 66 n.1. There are several problems with this argument.

First, XBS filed an opposition to Hill's motion for certification immediately prior to filing this summary judgment motion, in which opposition it contended that the proposed class, which included the 2002 DRP signatories but excluded the 2012 DRP signatories, failed because of individualized damages issues and because Hill and the proposed class did not have a proper claim under XBS's theorized interpretation of the MWA. XBS also previewed its summary judgment motion in this opposition filing by stating that "[n]ow that [Hill's] counsels' argument(s) have finally been revealed, Defendants will move for summary judgment" on its theory that "Hill's argument(s) are simply a misstatement of the law" with respect to the purported underpayment that was applicable to every single class member's claims, 2002 DRP signatories included. For this reason, XBS argued that the district court should "consider that motion prior to ruling on class certification" in light of the caselaw encouraging district courts to exercise their discretion and rule on summary judgment motions first if doing so would obviate further litigation. It was against this backdrop that XBS filed its summary judgment motion. This timeline creates a strong inference that XBS understood that even if no class were yet certified, its success on the merits of its theory that the class was paid the proper amount for its work under a payment plan that was compliant with the Washington MWA would defeat Hill's claims as well as the claims of all of the other individuals in the proposed class (including the signatories to the 2002 DRP) that XBS was simultaneously trying to stop from being certified.

Attempting to obtain a judicial resolution on the merits of the causes of actions undergirding all the class claims that XBS expressly knew would affect more than just the named class representative, in this context, evinces XBS's desire to remain in a judicial forum rather than to seek refuge in arbitration.

Second, XBS actually argued in its summary judgment motion that the district court should resolve the open issue whether the "structure of the compensation system[]" "violate[d] the Washington Minimum Wage Act" because that resolution would "obviate the need for certification." And XBS's entire briefing on whether its compensation structure violated the MWA focused on aspects of the complaint that were applicable to the "agents" of the company and the arguments that "class counsel" had made but were "not advanced by Hill." In fact, XBS made the fact that it was attacking both Hill and the absent class members (which XBS defined as including the 2002 DRP signatories) express. It argued that Hill's theory regarding the compensation structure could not prevail because it would "harm[] *the very people Hill allegedly seeks to represent*." (emphasis added). The language XBS used in its own briefing belies the dissent's contention that XBS was focused solely on arguing against Hill when it submitted its summary judgment motion. It explicitly distinguished between Hill and the class counsel and made frequent reference to the claims of the class members rather than just to Hill. This strategic language employed in the summary judgment briefing bespeaks XBS's desire to obtain a judicial resolution on the merits of the 2002 DRP signatories' claims.

Again, the dissent's choice to read the question in isolation fails to appreciate the context that evidences XBS's inconsistency with respect to its arbitration rights under the 2002 DRP. The context explains why the fact that Hill was the only joined party to the lawsuit does not do the work the dissent believes it does. XBS may have nominally been litigating against Hill at the time. But its strategic approach to the impending class certification reveals that XBS knowingly argued about the merits of all class members' claims, whether arbitrable or not, for the express purpose of obtaining a judicial order that would foreclose all class claims. This go-for-broke strategy to end the litigation in one fell swoop *judicially*—without any suggestion that XBS intended on

These actions present a clear narrative of XBS's strategic choice to engage the judiciary for resolution of the class claims rather than to obtain a resolution from an arbitrator. Taking them together, XBS treated its arbitration right under the 2002 DRP as akin to the other class claims that XBS viewed as meritless not because of any contractual right XBS held, but because XBS believed that its ABC payment structure was legally compliant with the Washington state wage law, which implied that no underpayment occurred. XBS repeatedly excluded the 2012 DRP but left the 2002 DRP to be litigated just the same as the non-arbitration bound class claims, like Hill's. XBS engaged in discovery and attacked the legal merits of those claims with a summary judgment motion, in which motion XBS made clear that it was challenging more than just Hill's litigation strategy: it employed language speaking to the ABC payment system writ large, it repeatedly referred to its agents as a whole, rather than referring just to Hill, and it even went so far as to distinguish, expressly, between Hill's arguments and her counsel's arguments on behalf of the "people Hill allegedly seeks to represent." Under our caselaw, XBS's behavior was inconsistent with its 2002 DRP arbitration right because it evinced a strong preference for judicial resolution of the 2002 DRP signatories' claims on the merits—namely, whether the ABC payment plan ran afoul of the MWA. As we have explained in cases past, now that XBS's strategic choice to litigate in federal court has failed to pan out, we will not endorse its attempt to play a game of "heads I win, tails you lose" by belatedly seeking refuge in arbitration for the resolution of those same claims. *Martin*, 829 F.3d at

---

retaining its right to arbitrate against the 2002 DRP signatories—could not be more inconsistent with XBS's arbitration right.

1125 (internal quotations omitted).

Indeed, even in 2019, XBS did not act consistently before the district court when it came to the 2002 DRP signatories. In a joint status report to the district court, XBS raised the issue of putative class members who had signed the 2002 DRP and explained that "now that Plaintiff has opened the door to this issue," "[a] certified class cannot include class members who entered into arbitration agreements." XBS also stated that it "anticipate[d] . . . filing its own motion regarding class certification issues." But XBS never filed such a motion, nor did it ask the district court to remove the 2002 DRP signatories from the certified class. When the district court did not address the 2002 DRP signatories in its August 13, 2019 order, XBS made no apparent, further effort to flag the issue for the court. XBS's actions both demonstrate its ability to raise these issues prior to the end of the opt-out period, and its failure to take a consistent approach as to whether the inclusion of the 2002 DRP signatories in the class was an issue that the district court should have addressed.

XBS's attempt to overcome these arguments by contending that the language in the class notice itself demonstrates that it had not acted inconsistently with respect to the 2002 DRP signatories is unavailing. XBS cites the following language as evidence of its consistent behavior: "Defendants have also raised other defenses including . . . that other Class Members are required to pursue their claims through individual arbitration." And it reads these "defenses" as necessarily incorporating and preserving its right to compel arbitration against the 2002 DRP

signatories.[23]   But we do not think the class notice saves
XBS from the unfavorable inferences drawn from XBS's
other actions.  The class notice at various points noted that
class members' rights would be adjudicated in the class
action unless they opted out, and it specifically noted that
employees who had signed the 2012 DRP were excluded
from the class, without expressly mentioning the 2002 DRP.
At most, the class notice noted that XBS might try to *argue*
that some persons receiving the notice who were not subject
to the 2012 DRP might also be required to pursue their
claims in arbitration.

But the language in the class notice that XBS points to
did not somehow insulate XBS from a finding that it had
waived any right to pursue arbitration under the 2002 DRP.
And a generalized reference to defenses does not foreclose
XBS's having engaged in litigation behavior that is
inconsistent with its exercising its right to arbitrate, as we
have found here.  This is especially true given the timing of
when XBS crafted the class notice: late 2019.  The class
notice was drafted after XBS had succeeded in excluding the
2012 DRP signatories from the class two separate times.  It
also was written after XBS had served discovery requests on
Hill evincing a desire to use the judicial forum to resolve the

---

[23] XBS appears to have failed to see the irony in making this argument.
Even though we do not find the language unequivocal as XBS does, by
contending that the notice's language identifies that XBS has "raised
other defenses"—which XBS contends include its right to compel
arbitration under the 2002 DRP—XBS has effectively conceded the
knowledge prong of the waiver analysis.  Namely, if XBS believes that
it could communicate its right to arbitration under the 2002 DRP in the
notice and that it in fact did, it admits that it both had knowledge of that
right and that it knew how to assert its intention of exercising that right
prior to having the actual ability to do so.

putative class members' claims, which putative class included the 2002 DRP signatories. And most importantly, the class notice was crafted after the six-year appellate detour XBS took to litigate the merits of the ABC system's compliance with the MWA, which merits-based decision would have effectively rendered the 2002 DRP signatories' claims a nullity had XBS's theory succeeded. XBS's choice of language for the class notice, was too little and far too late.

Overall, considering the *totality* of the circumstances, as we must,[24] we hold that the district court properly found that XBS has acted inconsistently with its right to compel arbitration under the 2002 DRP.

## C. Futility

Finally, XBS asserts two reasons why it would have been "futile" for it to have filed a motion to compel arbitration sooner than it did, and that, accordingly, its otherwise clear waiver of the right to compel arbitration should be excused. The doctrine of futility establishes that a party unable to assert a right due to the prevailing state of the law is excused from conduct otherwise constituting waiver.

*Fisher v. A.G. Becker Paribas, Inc.* acknowledged a futility defense to negate a party's failure to compel arbitration earlier in the litigation. 791 F.2d 691, 693 (9th Cir. 1986). There, a securities firm had been sued by a group

---

[24] *See, e.g., Newirth*, 931 F.3d at 942 ("Under the totality of these circumstances, we conclude that Aegis knowingly decided to defer its right to compel arbitration to avail itself of the benefits of the federal court forum, an intentional action inconsistent with its known right to compel arbitration."); *Martin*, 829 F.3d at 1126 ("We agree with the district court that the totality of these actions satisfies this element [inconsistent acts].")

of investors on both federal securities law claims and state law claims.  *Id.* at 692.  The investors had signed contracts with the securities firm agreeing to resolve any dispute by arbitration.  *Id.* at 693.  However, there was a growing recognition of the judicial doctrine known as "intertwining," which prevented a party from compelling arbitration when a lawsuit contained both arbitrable and nonarbitrable claims that arose from the same transaction.  *Id.* at 695–97.  Under an application of the "intertwining" doctrine, the securities firm in *Fisher* would not have been able to compel arbitration of the state law claims (which were otherwise arbitrable), as the federal securities law claims were nonarbitrable at that time.  *Id.* at 697.[25]

The initial lawsuit in *Fisher* was brought in August 1981. *Id.* at 696.  The Supreme Court rejected the "intertwining" doctrine in March 1985.  *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213 (1985).  Therefore, from August 1981 until the decision in *Dean Witter Reynolds* was handed down in March 1985, the securities firm did not file a motion to compel arbitration due to its belief that doing so would have been "futile."  *Id.* at 693.  However, shortly following *Dean Witter Reynolds*, the securities firm filed a motion to compel arbitration.  *Id.*  The district court denied the motion after finding the right to compel arbitration was waived.  *Id.*  This court in *Fisher* reversed and remanded on the basis of futility.  *Id.* at 698.

Notably, our circuit did not formally recognize the "intertwining" doctrine until February 1984 in *Byrd v. Dean*

---

[25] Federal securities claims arising under the Securities Act of 1933, as were asserted in *Fisher*, were not arbitrable until the Supreme Court decided *Rodriguez de Quijas v. Shearson/American Express Inc.*, 490 U.S. 477 (1989).

*Witter Reynolds, Inc.*, 726 F.2d 552 (9th Cir. 1984), the case the Supreme Court took on appeal and ultimately used as the vehicle to reject the "intertwining" doctrine altogether. Therefore, from August 1981 (the filing of *Fisher*) through our decision in *Byrd* in February 1984, the doctrine of "intertwining" was not established in Ninth Circuit caselaw. *Id.* at 697. However, *Fisher* found that although there was no binding precedent establishing "intertwining" in this circuit, the securities firm

> correctly suggested that it would have been futile for it to make a motion to compel arbitration at the outset of this litigation. As noted above, counsel for [the securities firm] examined the complaint filed by the Fishers and decided, based on our comment in *De Lancie v. Birr, Wilson & Co.*, 648 F.2d 1255, 1259 n.4 (9th Cir. 1981) and the trend of federal authority, that a motion for arbitration would have been denied because the claims were not severable. An evaluation of existing case law on this subject from 1981 to 1985 would have indicated to any competent attorney that an agreement requiring arbitration of disputes involving securities law violations was not enforceable in this circuit until the Supreme Court's repudiation of the rule in 1985.

*Id.* Following *Fisher*, we have seldom had occasion to discuss the contours of our futility jurisprudence. However, we provided the following commentary on futility in *Gutierrez v. Wells Fargo Bank, NA*, 704 F.3d 712 (9th Cir. 2012):

Wells Fargo claims that any "existing right" arose only after *Concepcion* and thus it did not act inconsistently with that "existing right" because it would have been futile to seek arbitration earlier. *See Fisher,* 791 F.2d at 695. The futility of an arbitration demand, however, is not clear cut here. In contemporaneous consumer litigation, *litigants did succeed* in compelling arbitration despite the existence of the *Discover Bank* rule. *See, e.g., Dalie v. Pulte Home Corp.,* 636 F.Supp.2d 1025, 1027 (E.D.Cal.2009) (recognizing that "under California law a class action waiver is only unenforceable in a narrow set of circumstances"); *McCabe v. Dell, Inc.,* No. CV 06–7811, 2007 WL 1434972, at *3–4 (C.D. Cal. Apr. 12, 2007) (compelling arbitration after finding the arbitration clause enforceable under California law); *Galbraith v. Resurgent Capital Servs.,* No. CIV S 05–2133, 2006 WL 2990163, at *2 (E.D. Cal. Oct. 19, 2006) (same). Especially because the CAA did not prohibit class arbitration, a motion to compel arbitration *was not inevitably futile* under the prescribed case-by-case analysis. *See Douglas v. U.S. Dist. Court for Cent. Dist. of Cal.,* 495 F.3d 1062, 1068 (9th Cir. 2007) (whether arbitration can be compelled "depends on the facts and circumstances developed during the course of litigation").

*Id.* at 721 (emphases added). Whatever tension may exist

between the futility standards articulated in *Fisher* (futility exists if the right asserted is not guaranteed to be enforced) and *Gutierrez* (futility exists only if the assertion of the right is guaranteed to fail), we are satisfied that XBS has not met its burden to establish futility.

On this point, XBS first reprises the argument that it would have been futile to file a motion to compel arbitration until after class certification and notice, as until after class certification and notice brings the unnamed class members into the case, the district court lacked jurisdiction over those individuals.  The short answer: waiver does not require a court to have jurisdiction over the beneficiaries of the waiver; it does not even require a lawsuit to have been filed.

As previously discussed, we do not hold that XBS was required to file a motion to compel before it did.  Instead, we simply recognize that under the circumstances of this case—and given XBS's various other actions (including raising the 2012 DRP arbitration agreement repeatedly during its motions practice before the district court)—it was permissible to find that XBS engaged in actions during the course of the litigation that were inconsistent with its right to compel arbitration under the 2002 DRP.  And we conclude that as a result, had it wanted to preserve its arbitration rights under the 2002 DRP, XBS had a choice to set the record straight by dispelling the notion that it was waiving its rights under that 2002 agreement.  Namely, rather than laying down a "use it or lose it" rule that will require future defendants with arbitration agreements to provide affirmative notice of their arbitration rights at a specific time during the litigation—which would be proper only for a forfeiture case—we find that XBS was at risk if it failed to provide notice of its intention to seek arbitration of the claims of signatories of the 2002 DRP because such notice

was needed to correct the impression of waiver that XBS itself created when it acted inconsistently with its 2002 DRP arbitration rights by its litigation practices in the courts.

For this reason, XBS errs in relying on our decision in *Moser v. Benefytt, Inc.*, 8 F.4th 872 (9th Cir. 2021). In that case, the district court held that a class action defendant had waived any objection to class certification based on the district court's lack of personal jurisdiction over non-California plaintiffs because the defendant had not included that defense in its Rule 12 motion to dismiss earlier in the suit, even though at the time of the Rule 12 motion, those out-of-state plaintiffs were only putative class members and were not yet parties to the litigation. *Id.* at 874–75. We explained that a defendant loses a motion to dismiss based on lack of personal jurisdiction by failing to include the defense in a Rule 12 motion only if that defense were "available" at the time of the motion. *Id.* at 877 (relying on the language in Fed. R. Civ. P. 12(g)(2)). And we held that as the defendant could not have raised a personal jurisdiction defense at the Rule 12 stage as to unnamed putative class members who were not parties and against whom a motion to dismiss could not yet be filed, such a personal jurisdiction defense was not then "available" under Rule 12(g)(2). *Id.* at 877–78.

*Moser* is of no help to XBS. Here, our holding affirming the district court is tied to XBS's litigation behavior as a basis for its waiver—not its failure to compel arbitration against putative class members—whereas *Moser* dealt with the operation of Rule 12 and was expressly tied to its language regarding the "availab[ility]" of the defense of lack of personal jurisdiction. Because we hold that the district court permissibly found XBS waived this right through its specific actions and inactions over the course of years of

litigation, *Moser* is inapposite. *Moser* would be analogous only if our holding in this case turned on the timeliness of XBS's motion to compel arbitration, because *Moser* assessed *at what stage of the litigation* that defendant was obligated to raise its personal jurisdiction defense by a motion to dismiss. Instead, our analysis here turns on the separate issue of whether XBS's litigation behavior evinces its knowledge of the right to compel arbitration and consequently, whether it acted inconsistently with that right.

That XBS took actions inconsistent with its arbitration rights under the 2002 DRP by choosing to raise the 2002 agreement as a defense only after engaging in six years of merits litigations that, had it been successful, would have defeated the claims by the signatories of the 2002 DRP agreement, despite having successfully preserved its 2012 DRP arbitration rights by seeking the 2012 DRP signatories' exclusion from the provisionally certified class, substantiates a finding of waiver. And under the circumstances of this case, because its actions were inconsistent with its arbitration rights under the 2002 DRP, had XBS wanted to avoid a waiver of the 2002 DRP arbitration rights, it was responsible for concretely signaling its intention to raise the 2002 DRP arbitration defense to the court[26]—an act that would not have been futile because it

---

[26] Because the dissent claims that this amounts to a novel forfeiture rule, Dissent at 81, it bears repeating why XBS was responsible for providing notice of its intention to compel arbitration under the 2002 DRP earlier in the litigation. This obligation does not arise because XBS's actions were untimely—in fact, it appears that XBS's motion to compel arbitration was in fact timely, which would make any finding that XBS *forfeited* its 2002 DRP arbitration rights legal error. We are holding instead that XBS needed to provide notice of its arbitration rights

would have put all relevant parties on notice of its claimed right to arbitrate the claims of the signatories of the 2002 DRP. Indeed, the success XBS obtained in having the 2012 DRP signatories excluded from the ABC Class is evidence enough that it would not have been futile for XBS to assert its right to compel arbitration under the 2002 DRP earlier in the litigation below.

XBS second argument claims that it would have been futile to compel arbitration under the 2002 DRP before the Supreme Court decided *Lamps Plus v. Varela*, 139 S. Ct. 1407 (2019). This is because, according to XBS, before *Lamps Plus*, it would not have been guaranteed individual arbitration under the 2002 DRP. This alternative futility argument fails for two reasons.

First, as XBS acknowledges, regardless whether arbitration were to be conducted individually or as a class, it had a valid right to compel arbitration under the 2002 DRP. To be sure, the differences between class arbitration and individual arbitration are significant. *See, e.g., AT&T Mobility v. Concepcion*, 131 S. Ct. 1740, 1751 (2011) ("[T]he switch from bilateral to class arbitration sacrifices the principal advantage of arbitration—its informality—and makes the process slower, more costly, and more likely to

---

because of *XBS's own actions*. The inconsistent actions that were highlighted earlier in this opinion and scattered throughout the procedural history of this case evinced XBS's intentional relinquishment of its known arbitration rights under the 2002 DRP as it sought its judicial claim for relief. Had XBS wanted to preserve these arbitration rights, XBS had an obligation to set the record straight by dispelling the impression, created by its own inconsistent actions, that it was waiving its 2002 DRP arbitration rights.

generate procedural morass than final judgment."). However, it strains credulity to argue that the difference between the two forms is vast enough to constitute categorically different rights, such that XBS could avail itself of a futility defense in this case. Whether individual or class-wide, arbitration differs from court litigation in several significant aspects, among which is the identity and nature of the decision maker.

Second, and more fundamentally, XBS advances an invalid argument as to why, under *Lamps Plus*, it is now guaranteed individual arbitration under the 2002 DRP. Before the district court, XBS argued that "it would have been futile for XBS to move to compel individual arbitration under agreements, like the pre-2012 agreements [i.e., the 2002 DRP], *that were silent regarding class actions*, until the Supreme Court's decision in *Lamps Plus*, 139 S. Ct. 1407, in 2019." (emphasis added). And in its briefing to this court, XBS again asserted that the 2002 DRP "did not discuss class actions." *Lamps Plus*, however, was not the first to address arbitration contracts akin to the 2002 DRP that were "silent regarding class actions." That issue had been resolved nearly a decade earlier in *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662 (2010), which held that class arbitration could not be compelled when the underlying contract was silent as to class arbitration versus individual arbitration. "[A] party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party agreed to do so. In [*Stolt-Nielsen*], however, the arbitration panel [had incorrectly] imposed class arbitration even though the parties concurred that they had reached 'no agreement' on that issue." *Id.* at 684. *Lamps Plus* addressed a separate issue, "whether the FAA similarly bars an order requiring

class arbitration when an agreement is not silent, but rather '*ambiguous*' about the availability of such arbitration." 139 S. Ct. at 1412 (emphasis added). Accordingly, XBS cannot rely on *Lamps Plus* as establishing any new law with respect to arbitration agreements that are silent regarding class arbitration, as that issue was decided nearly a decade earlier by *Stolt-Nielsen*.[27]

Altogether, it would not have been futile for XBS to assert the 2002 DRP throughout the course of the litigation below in the same manner as it did the 2012 DRP. Thus, we decline to excuse XBS's waiver-worthy litigation conduct as being precipitated by futility.

---

[27] The dissent takes issue with our conclusion that XBS's reliance on *Lamps Plus* does not support its futility argument because in the dissent's view, "the record shows that XBS sincerely believed" that *Lamps Plus* changed the law. Dissent at 73. This argument cannot be credited. The Supreme Court began its opinion in *Stolt-Nielsen* with the following statement: "We granted certiorari in this case to decide whether imposing class arbitration on parties whose *arbitration clauses are 'silent' on that issue* is consistent with the Federal Arbitration Act (FAA)." 559 U.S. at 666 (emphasis added). That opinion proceeded to mention "silence" or "silent" sixteen times throughout its analysis. After this decision, nothing short of willful blindness could permit a party to hold a "sincere[] belie[f]" that it would be forced into class-wide arbitration because its arbitration contract was silent on the matter. As Hill filed the first complaint in this case almost two years after this decision was handed down, XBS had actual knowledge of the *Stolt-Nielsen* holding. Therefore, XBS's inconsistent behavior with respect to the 2002 DRP constituted a knowing relinquishment of its arbitration rights. *See Gutierrez*, 704 F.3d at 721–22 (rejecting a similar argument that it would have been futile to move for arbitration until the Supreme Court decided *Concepcion* because previous caselaw had protected the same right).

## IV. CONCLUSION

For all the foregoing reasons, we affirm the district court's order denying Appellant's motion to compel arbitration under the 2002 DRP.

---

VANDYKE, Circuit Judge, dissenting:

This should not be a hard case. Under our precedents, a defendant may waive a right to compel arbitration only by intentionally relinquishing it. *Fisher v. A.G. Becker Paribas, Inc.*, 791 F.2d 691, 694 (9th Cir. 1986). That intention can be express or implied. But for nearly four decades, this court has refused to find implied waiver unless a defendant completes concrete acts "inconsistent with the right to arbitrate." *Newirth by & through Newirth v. Aegis Senior Cmtys., LLC*, 931 F.3d 935, 940 (9th Cir. 2019). A plaintiff who seeks to prove inconsistent acts faces a heavy burden. *Fisher*, 791 F.2d at 694.

XBS never took a single act inconsistent with its intent to arbitrate the claims of its call-center employees who had signed arbitration agreements. That fact alone should end our analysis in this case. But there is more. XBS from an early date advised named plaintiff Ms. Hill and the district court of its intent to compel arbitration against those employees should the putative class be defined to include them. And during its extended litigation against Ms. Hill—with whom it could not arbitrate, and therefore was required to litigate—XBS took no action that uniquely targeted absent class members and not Ms. Hill. *And* XBS moved to compel arbitration against every class member with whom it had an arbitration agreement on literally the first day after it could

do so.

The majority does not dispute those facts, but it avoids the outcome they require by transforming our clear waiver rule into an opaque forfeiture rule. Under this new rule, a defendant loses its right to arbitrate against absent class members unless it affirmatively asserts the right long before it even knows who might be in the class, and even though it has no right to arbitrate with the named plaintiff with whom it is actually litigating. And even if a defendant nonetheless speaks into the void that it someday plans to arbitrate against some absent class members when that opportunity sometime ripens, it *still* forfeits that right if any of its routine precertification litigation activities against the named plaintiff is later deemed to have an indirect effect on potential class members with whom it has arbitration agreements.

This break from precedent is premised on little more than the majority's misunderstanding of how much it may rely on its own preferences and instincts instead of on concrete acts to find waiver. The majority may feel XBS should have given more explicit notice about its intentions to compel arbitration against potential class members sooner than it did. The majority also may feel that lack of such explicit notice—which we've never required—unmasks XBS's clandestine intent not to arbitrate if and after a class was certified. But precedent places no such burdens on defendants and no stock in the majority's preferences and unconfirmed instincts. I therefore respectfully dissent.

## I. DISCUSSION

Ms. Hill filed her initial complaint in April 2012, purporting to represent a large class of current and former XBS call-center employees. A question as to her adequacy

as a class representative quickly arose because she—unlike most of the employees in that putative class—had never signed an arbitration agreement.  The district court did not immediately answer that question, which delayed certification of the class.  But the clock was already ticking on Ms. Hill's individual claims.  XBS threaded a needle for the next two years, litigating issues that applied to Ms. Hill while (1) providing to Ms. Hill and her counsel the 2002 arbitration agreement binding on many of the putative class members, and (2) telling the district court and Ms. Hill that it reserved its right to compel arbitration against members of the potential future class who had signed arbitration agreements.

In July 2014, the district court granted Ms. Hill's motion to certify the putative class.  But even then, the court declined to define that class while Ms. Hill and XBS battled in state court over the certified question of whether Ms. Hill, as an XBS call-center agent, was an hourly or piece-rate worker.  *See Hill v. Xerox Bus. Servs., LLC*, 868 F.3d 758, 763 (9th Cir. 2017) (certifying question); 426 P.3d 703, 708–09 (Wash. 2018) (answering certified question); 771 F. App'x 771, 772 (9th Cir. 2019) (affirming and remanding) (mem).  Five more years trickled through the hourglass without XBS ever litigating an issue unrelated to Ms. Hill particularly and her attempt to finally certify a class.

XBS's slog through litigation against Ms. Hill reached a crossroads in July 2019, when she moved the district court to define the class to include signatories to the 2012 DRP. Her request represented an abrupt about-face from her earlier stipulation that those signatories were *not* members of the putative class, and XBS immediately objected to her attempt to smuggle thousands of new call-center employees into the class at the eleventh hour.  In the parties' first joint status

report after Ms. Hill's motion, XBS told her and the district court that "[i]f individuals subject to arbitration agreements are included in the class," it anticipated "bringing motions to compel individual arbitration once the class is finalized." XBS doubled down the following week, urging the district court to "find that individual arbitration agreements preclude class certification altogether" and thus decertify the class. As it had since Ms. Hill first brought this case, XBS still took no litigative action unrelated to Ms. Hill and her attempt to certify the class.

When the district court later issued an order defining the class to exclude the 2012 signatories, it did not mention the 2002 signatories. XBS worked with Ms. Hill to develop a final list of class members for the purposes of notification, but it reiterated to her counsel that it believed the 2002 signatories were subject to individual arbitration. The day after the notice administrator reported a final list of class members that included thousands of those signatories, XBS moved to compel arbitration with them. No one disputes that this was the earliest that XBS could have done so.

## A. Legal Standard

An "examination of whether the right to compel arbitration has been waived must be conducted in light of the strong federal policy favoring enforcement of arbitration agreements." *Fisher*, 791 F.2d at 694. As such, the burden is on the plaintiff to show that a defendant has waived its right to compel arbitration. *Id.* She must demonstrate not only the defendant's "knowledge of an existing right to compel arbitration," but also the defendant's "intentional acts inconsistent with that existing right." *Newirth*, 931 F.3d at 940; *see also Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 1713–14 (2022).

Some aspects of that second requirement are, unfortunately, murky: "There is no concrete test to determine whether a party has engaged in acts that are inconsistent with its right to arbitrate," and so we ask whether "a party's actions indicate a conscious decision to seek judicial judgment on the merits of the arbitrable claims." *Newirth*, 931 F.3d at 941 (cleaned up). But at least three things are clear. First, "a party acts inconsistently with exercising the right to arbitrate when it (a) makes an intentional decision not to move to compel arbitration and (b) actively litigates the merits of a case for a prolonged period of time in order to take advantage of being in court." *Id.* Second and inversely, "parties do not act inconsistently with a right to compel arbitration when they engage in litigation activities that do not evince a decision to take advantage of the judicial forum." *Id.* Third, litigation alone does not evince waiver if it is not "a strategic decision to 'actively litigate,' i.e., to forgo the right to compel arbitration and take advantage of a judicial forum." *Id.* (cleaned up) (quoting *Britton v. Co-op Banking Grp.*, 916 F.2d 1405, 1413 (9th Cir. 1990)).

Those requirements, until today, have ensured that we remember a key fact: "Waiver is different from forfeiture." *United States v. Olano*, 507 U.S. 725, 733 (1993). On the one hand, waiver is the "intentional relinquishment or abandonment of a known right," *id.* (cleaned up), such that it must be "affirmative and intentional," *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). On the other hand, forfeiture can be inadvertent and often occurs due to a "mistake or oversight," *United States v. Williams*, 930 F.3d 44, 64 (2d Cir. 2019) (internal citation omitted), such as a party's "failure to make the timely assertion of a right," *Berkshire*, 928 F.3d at 530. To be sure, parties "can

impliedly waive a right." *Newirth*, 931 F.3d at 942; *see also Van Ness Townhouses v. Mar Indus. Corp.*, 862 F.2d 754, 759 (9th Cir. 1988). But a right can be impliedly waived only if "the parties' actions amount to a knowing relinquishment of that right." *Newirth*, 931 F.3d at 942; *see also Van Ness Townhouses*, 862 F.2d at 759.

## B.    Analysis

Applying this legal standard to the facts in this case, the outcome is clear. XBS could have waived its right to compel arbitration only if it took some concrete act suggesting it intended to waive that right. More than a decade into litigation, it still hasn't taken any such act. Ergo, it did not waive its right. No simpler syllogism ever echoed in Aristotle's Lyceum.

The majority does not really dispute the minor premise of that syllogism, i.e., the nonexistence of any concrete act that demonstrates waiver. Nor could it. But the majority erases the major premise and scribbles a novel forfeiture rule in its place. Under that new rule, a defendant forfeits its right to compel arbitration not only if it engages in a concrete inconsistent act, but also if a court conjectures from the "totality of the circumstances" that the defendant secretly intended to forfeit that right. Such a radical and unbounded expansion of waiver finds no support in precedent, and in any event fails here even on its own terms.

### 1. The Majority Offers No Evidence of Any Concrete Act of Waiver.

There are special considerations for the waiver analysis in class actions, and those considerations are at the heart of my disagreement with the majority. In a simpler world in which Ms. Hill herself was subject to an arbitration

agreement like the putative class members she sought to represent, XBS could have (and presumably would have) immediately moved to compel arbitration with her. If it instead opted to litigate against her, we could reasonably conclude that XBS had intentionally waived its right to arbitrate her claims. But because Ms. Hill was *not* in fact subject to any arbitration agreement with XBS, XBS could not compel her to arbitrate her claims or class certification issues. Nor could XBS move to compel arbitration against putative class members who had signed arbitration agreements until after the class was finally certified and its members identified. Meanwhile, XBS needed to determine whether Ms. Hill's individual claims could survive a motion to dismiss or a motion for summary judgment. And XBS disagreed that her class claims satisfied all Rule 23 criteria. Possessing no contractual right to arbitrate any of *those* issues, XBS had to litigate them in court.

It is black-letter law that, until the class was finally certified and notice given, none of the absent putative class members were actually parties to the litigation between Ms. Hill and XBS. *See Smith v. Bayer Corp.*, 564 U.S. 299, 313 (2011) (rejecting "the novel and surely erroneous argument that a nonnamed class member is a party to the class-action litigation *before the class is certified*" (internal quotation marks and citation omitted)). Presumably because of this, XBS limited its precertification litigation to issues related to Ms. Hill and her attempt to certify a class. Time and again and without exception, XBS restricted its answers, discovery, motion for summary judgment—everything—to issues related to Ms. Hill's personal claims and her proposed class's alleged inadequacies under Rule 23.

This tailoring of XBS's litigation activity was no doubt informed by a bright-line distinction well-understood until

smudged today.  Waiver analysis in a case like this involving a named plaintiff who did not sign an arbitration agreement requires a court to distinguish between a defendant who (1) actively litigates against someone with whom the defendant has no right to arbitrate or against class certification generally, from one who (2) attempts to actively litigate against someone with whom the defendant *does* have a right to arbitrate.  Only the latter defendant can be said to have acted consistent with an intent to waive its right to arbitrate. In contrast, a defendant sued by a named plaintiff seeking to certify a class and who defends the lawsuit in court before the class is certified, cannot be said to be making an "intentional decision" to "take advantage of being in court" when that defendant is powerless to force the named plaintiff to arbitrate either her own claims or class certification. *Newirth*, 931 F.3d at 941.  That's because the defendant has no choice but to defend against the named plaintiff's claims in court.  Likewise, when the same defendant fights against class certification in court it cannot be said to be taking advantage of litigating in the judicial forum because it has no option to do otherwise; it cannot force the named plaintiff to arbitrate the question of class certification.

It is against that background understanding that we should evaluate whether XBS did anything to evince an intention to litigate specifically against the 2002 signatories. The majority says it did, pointing to three "acts" in this case that together purportedly expose XBS's covert intent to waive its right to compel arbitration against those specific class members.  First, XBS supposedly moved for partial summary judgment on the issue of "whether unnamed class members subject to XBS's ABC Pay scheme were 'piecemeal' workers" under Washington's Minimum Wage Act.  Second, XBS requested "extensive discovery on

unnamed parties to the case," which "necessarily included signatories to the 2002 DRP." Third, XBS many times "asserted as a ground for obligatory arbitration the 2012 DRP without also asserting the same for the 2002 DRP." I will discuss each in turn.

### a. XBS's motion for summary judgment

The majority's first purported "act" cannot prove XBS's intent to waive for the simple reason that it never happened. The majority portrays XBS's summary judgment motion as directed at "unnamed class members." But the motion nowhere mentions "unnamed class members," and even a quick reading makes clear that, as one might expect, the motion addressed Ms. Hill and her claims.

While the majority can't show that XBS's motion for summary judgment *actually* addressed absent class members, what it instead relies on is that a grant of summary judgment against Ms. Hill could have indirectly affected the claims of the putative class members she purported to represent. Sure. That will usually be the case when litigating against a named plaintiff of a putative class action. But indirect downstream effects are not the same as active litigation *against the class members* or their claims. XBS's motion was entirely consistent with the fact that it was actively defending itself against *Ms. Hill's* claims. By moving for summary judgment and making the arguments it made, XBS did nothing different than what it would have done if Ms. Hill had brought an individual action for her own claims instead of a putative class action. XBS had little choice but to seek summary judgment against Ms. Hill at that stage of the case, and the fact that it did so shows only that it was actively litigating against her, not against the then-

uncertified class.[1]

---

[1] A careful reader might be confused by how the majority and I differently use the concept of whom the litigation was "directed at." I use the concept to refer to whomever XBS's litigation conduct was aimed at *as a legal matter*. Thus, for example, when XBS made arguments in support of its motion for summary judgment *against Ms. Hill*, I consider those arguments as directed at Ms. Hill, not at absent class members. It would have been strange indeed had XBS made arguments directed *against absent class members* in support of its summary judgment motion, since those class members were not parties to the case.

Only once does the majority claim XBS did anything like that—directed its arguments against class members to the exclusion of Ms. Hill—and the majority is simply wrong. It selectively quotes one of XBS's summary judgment briefs before the district court, claiming XBS therein contested a claim "raised by 'class counsel'" but "'not advanced by Hill.'" But contrary to the majority's suggestion, XBS never attempted to direct any argument against the absent class members and not Ms. Hill. Instead, in the passage referenced by the majority XBS merely highlighted that Ms. Hill in her deposition had disavowed any independent knowledge of a claim that her counsel had raised in her answers to interrogatories. XBS never said it was contesting a claim related only to the class and not to Ms. Hill.

Instead, the key difference between the majority opinion and this dissent is that the former generally appears to embrace what might be called the "ricochet" view of targeting, ignoring whomever XBS's legal arguments were technically directed at, and looking instead to whomever the majority thinks XBS may have sub rosa hoped could be indirectly affected by its legal arguments if they were successful against Ms. Hill. Under the majority's view, a defendant such as XBS apparently targets class members against whom it cannot yet litigate when it trains its sights on a named plaintiff such as Ms. Hill, directing its arguments against her as a legal matter, but with the surreptitious hope of *also* indirectly affecting the absent class members' claims. That is, a defendant can target a hypothetical future class member—at least for waiver purposes—even when as a legal matter its litigation activity is directed

Notably, XBS's summary judgment motion is the only example of active litigation the majority references.  So even if moving for summary judgment against Ms. Hill somehow also counted as "active litigation" against the uncertified class (which it should not), this single "act" would not come close to the "prolonged" litigation that we have required in other cases to find waiver.  *Newirth*, 931 F.3d at 941.  For example, in *Van Ness Townhouses*, which the majority views as "instructive," the defendants made a "conscious decision" to waive arbitration by "answer[ing] the complaints and amended complaints, … mov[ing] to dismiss the action," "approving a pre-trial conference order," and allowing the district court to set a trial date, all without ever "rais[ing] the issue of arbitration."  862 F.2d at 756, 759.  Importantly, the defendants in *Van Ness Townhouses* did all this while they "had an existing right to compel arbitration"; indeed, we explained that had the defendants "moved to compel arbitration" at any point, "the district court would have been required to grant that motion."  *Id.* at 759.  Here, it is undisputed that XBS had no such right in litigating against Ms. Hill.  Ever.

The distinctions are even starker in other cases.  In *Martin v. Yasuda*, for example, we found waiver only after, inter alia, the defendants "devoted considerable time and effort to a joint stipulation structuring the litigation, filed a motion to dismiss on a key merits issue, entered into a protective order, answered discovery, and prepared for and

---

only at a named plaintiff with whom it has no arbitration agreement.  This expansive view of who precertification litigation is directed against does most of the work for the majority, since in every inchoate class action the defendant's precertification litigation against the named plaintiff will inevitably have some possible indirect effect on then-absent putative class members.

conducted a deposition." 829 F.3d 1118, 1126 (9th Cir. 2016) (cleaned up). Again, all while the right to compel arbitration was just sitting there available but unexercised. And significantly, the defendants in *Martin* also "told the district judge and opposing counsel that they were likely 'better off'" litigating the case in court "than handling it in arbitration," and were even "warned … about the possibility of waiver." *Id.* at 1122, 1126. Nothing of the sort remotely happened here. The majority treats XBS as though it actively litigated *against the class* for years, when in fact the majority can point to only one example of active litigation— that was not even against the class.

### b. XBS's "extensive" precertification discovery

The majority's second purported "act" is, like the first, premised on a mistaken understanding of the record. Ms. Hill described XBS's discovery requests as "extensive." The majority repeats her characterization verbatim, claiming that XBS "sought to take advantage of litigation in federal court by requesting *extensive* discovery." But XBS's discovery requests consisted of only a handful of interrogatories and requests for production, as well as a grand total of two depositions. That's it. Notably, XBS's interrogatories and requests for production were never served on any putative class member. It is a stretch to call this "extensive" discovery, particularly given the breadth of Ms. Hill's claims and the size of the class she sought to represent.

But putting that aside, the amount of class discovery sought by XBS should be entirely irrelevant to the court's analysis under our test for waiver. To be consistent with precedent, we must focus on *inconsistency*. And an act is "inconsistent" with preserving the right to arbitrate only if a

defendant is litigating something that it could have arbitrated instead.  *See* Black's Law Dictionary 915 (Bryan A. Garner ed., 11th ed., 2019); Webster's Third New Int'l Dictionary 1144 (1986).  Nothing in the discovery XBS sought—or in the documents and answers Ms. Hill provided in response— can   fairly   be   understood   to   have   created   such incompatibility.

It is the norm in class litigation for a defendant like XBS to conduct such precertification discovery.  *See, e.g.*, *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 942 (9th Cir. 2009) ("Our   cases   stand   for   the   unremarkable proposition that often the pleadings alone will not resolve the question of class certification and that some discovery will be warranted."); 1 McLaughlin on Class Actions § 3:7 (19th ed. Nov. 2022) (explaining that "in most cases discovery into issues   relevant   to   class   certification   is   warranted   and appropriate" and that "it is ordinarily an abuse of discretion to deny any class certification discovery").  In fact, Rule 23 of the Federal Rules of Civil Procedure was amended two decades   ago   for   the   express   purpose   of   accommodating precertification discovery like that which XBS requested.[2]

Such precertification discovery is par for the course in class action litigation precisely because such *class* discovery is expected to "illuminate" *class certification* issues.  Class discovery is not expected to determine or exhaust merits issues unique to the absent class members, even if there can

---

[2] *See* Report of the Judicial Conference Committee on Rules of Practice and Procedure 10 (Sept. 2002) (available at https://www.uscourts.gov/si tes/default/files/fr_import/ST9-2002.pdf) (explaining that Federal Rule of Civil Procedure 23(c)(1)(A) was amended to clarify that "[a] certain amount   of   [precertification]   discovery   may   be   appropriate … to illuminate issues bearing on certification").

be some overlap.  This case is no exception.  In fact, early on, the district court ordered that "[u]ntil the issue of certification is resolved, discovery is limited to class certification issues."  If requesting discovery about *class* issues at the *class certification stage*—which happens in essentially every putative class action—is now to be treated as proof of a defendant's secret intent to waive the right to compel arbitration, we should just be more forthright and explain that defendants must assert their intent to compel arbitration against uncertified class members by some specific deadline during or before class certification proceedings.  If we did that, it would be more obvious that the majority's supposed intentional waiver conclusion is really a disguised accidental forfeiture deadline.  But at least it would be a clear rule parties could use to guide their behavior, instead of leaving them to guess how much precertification litigation against the named plaintiff, together with run-of-the-mill class discovery, will result in the "waiver" of merits defenses available only against the class.**[3]**

Unlike the majority, I would conclude that parties should be allowed to engage in normal precertification class discovery without fear of waiving any right to compel arbitration.  By repackaging XBS's class certification-stage discovery requests as proof of intentional waiver of a merits issue, the majority creates both a new rule and unnecessary uncertainty.  And as with its treatment of XBS's necessary

---

[3] Because the majority declines to adopt a bright-line rule today, no class-action defendant within this circuit can know for sure when a district court might find that precertification litigation has proceeded long enough for the judge to deem him or her to have waived a right to compel arbitration.  That line will differ judge by judge, court by court, and case by case.

litigation against Ms. Hill, this feels like an unwinnable Catch-22 for defendants like XBS.

Perhaps recognizing the unfairness of a general "waiver-if-you-seek-class-discovery" rule, the majority claims that "[i]t is clear from the record that XBS *explicitly* sought extensive discovery as to *2002 DRP signatories*." This is both legally irrelevant and untrue. Neither the 2002 DRP nor its signatories are mentioned in any of XBS's interrogatories or requests for production, and the majority does not point to a single request that "explicitly" references either. This is because XBS's requests referenced "Putative Class members" generally. And while this of course "necessarily included" information relating to 2002 signatories—in the sense that general class discovery "necessarily included" *every* putative class member—this is neither surprising nor "clear" proof that "XBS explicitly sought extensive discovery on 2002 DRP signatories" independent of the limited discovery about the proposed class generally. Rather, as with the majority's other "acts," it is simply the natural byproduct of XBS defending itself against Ms. Hill, who purported to represent those same signatories, and her attempts to certify a class that included them.

### c. XBS's different treatment of the 2002 and 2012 DRPs

The majority's third purported "act" showing XBS's intent to waive its arbitration right is XBS's more frequent mention of the 2012 DRP than of the 2002 DRP during

precertification proceedings.[4]  That trivia is irrelevant to our analysis because XBS was not *required* to raise that defense against either subset prior to certification.  So the comparison between how much XBS relied on the 2012 DRP versus the 2002 DRP while opposing class certification is a red herring.  It shows that XBS *could have* discussed the 2002 DRP more.  But it says nothing about whether XBS *needed* to do so to avoid waiver (or, more accurately, forfeiture).[5]

Even sidelining the majority's confusion between what XBS did with what it was required to do, its criticism also presumes the 2002 and 2012 DRPs are identical with respect to class certification.  But the two are "very different."  Ms. Hill's counsel admitted as much during oral argument, and the majority's protestations to the contrary are unconvincing.

The majority acknowledges, for example, that the 2012

---

[4] Notably, XBS had no reason to raise either the 2002 DRP or the 2012 DRP in defending against Ms. Hill's claims.  The agreements were entirely irrelevant because Ms. Hill never agreed to them.  *See Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017) ("'[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986))).

[5] The majority's emphasis on the fact that XBS relied more on the 2012 DRP when it made class certification arguments might be taken as an equal treatment rule.  That is to say, while a class action defendant is not required to raise arbitration agreements during class proceedings to avoid later waiver, if it raises one such agreement, it must raise them all.  If that is what the majority means, it is not clear where this novel rule comes from, and it will be very confusing for class-action litigants and lower courts to apply.  Particularly where, as here, the various agreements are different and arguably had different implications for class certification.

DRP "expressly barred class-wide litigation of any claims," whereas the 2002 DRP did not. In fact, the 2002 DRP is silent with respect to class actions or class-wide arbitration. This distinction is significant because XBS believed, and continues to argue, that the 2002 DRP's lack of a class-action waiver limited its usefulness in arguing against class treatment of those signatories' claims before the Supreme Court's decision in *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407 (2019). The majority apparently disagrees with that assessment, but the record shows that XBS sincerely believed it to be correct.[6] And XBS's belief that the 2002 DRP was less relevant as an argument against class certification, even if mistaken, cannot "amount to a *knowing*

---

[6] The majority insists that XBS could not *really* have believed this during the years between *Stolt-Nielsen* and *Lamps Plus*, because the Supreme Court in *Stolt-Nielsen* was clear enough that there was no right to class arbitration hiding in the shadows of silent contract provisions. I don't disagree with the majority's reading of *Stolt-Nielsen*—especially looking back on it from the vantage point of *Lamps Plus*. But the majority overlooks a phenomenon unfortunately experienced too often by those who practice regularly before *our* court, which is that sometimes notwithstanding the Supreme Court's clarity, the Ninth Circuit somehow garbles the reception.

A few circuits bristled at being bridled by *Stolt-Nielsen* and resisted applying its holding by construing its language narrowly and inventing distinctions to cabin it. *E.g.*, *Jock v. Sterling Jewelers Inc.*, 646 F.3d 113, 120–21 (2d Cir. 2011). Our circuit was part of that resistance, engaging in sporadic but "palpable evasion of *Stolt-Nielsen*" up to the day the Court reversed us in *Lamps Plus*. *Varela v. Lamps Plus*, 701 F. App'x 670, 673 (9th Cir. 2017) (Fernandez, J., dissenting), *rev'd*, 139 S. Ct. 1407 (2019). Indeed, the Supreme Court took up *Lamps Plus* precisely *because* it needed to clamp down on the waywardness of our court. It is more than a little unfair for the majority to accuse XBS of "willful blindness," when that label might more accurately apply to our own court's treatment of *Stolt-Nielsen* until *Lamps Plus*.

relinquishment of th[e] right" to later compel arbitration. *Newirth*, 931 F.3d at 942 (emphasis added).[7]

In any event, XBS raised the 2002 DRP in defending against Ms. Hill and class certification more than a dozen times over a period of eight years, including: in its answers to her original and amended complaints; in response to her discovery requests; in various communications with her counsel; in a draft and final Joint Status Report shared with her counsel and submitted to the district court; in response to her motion to define the scope of the class;[8] in a declaration supporting the parties' stipulated motion to approve class notice; and in the notice sent to putative class members.

In short, XBS was not required to make certain class arguments in opposing class certification to avoid losing its ability to compel arbitration once that right ripened. But even if it had been required to do so, XBS repeatedly raised the 2002 DRP with Ms. Hill's counsel and the district court. And while XBS did not mention the 2002 DRP as much as it did the 2012 DRP, this does not show that XBS made a "conscious decision" to intentionally waive its right to compel arbitration under the 2002 DRP. *Id.* at 941. Rather, any difference in treatment is legally irrelevant and, in any

---

[7] I want to be clear: moving to compel arbitration before XBS did so would have been futile regardless of *Lamps Plus*. *See Newirth*, 931 F.3d at 942; *Letizia v. Prudential Bache Secs., Inc.*, 802 F.2d 1185, 1187 (9th Cir. 1986). I mention *Lamps Plus* merely to provide one reasonable explanation for why XBS may have treated the 2002 DRP differently than the 2012 DRP *for class certification purposes*.

[8] Although XBS explicitly raised the 2002 DRP with the district court in arguing against class certification, the district court ignored its argument and focused instead only on its arguments concerning the 2012 DRP.

event, explained by material distinctions in the content of the agreements.

* * *

So to summarize: none of the three purported "acts" of XBS the majority points to supports a conclusion of waiver because each "act" intentionally related to *Ms. Hill*, with whom XBS had no right to arbitrate.  Each of the "acts" the majority relies on took place well before class members became parties to this case, at a time when XBS was litigating against only Ms. Hill, who never agreed to arbitrate her claims.  To be sure, Ms. Hill sought class certification in her initial complaint, but "a class action, when filed, includes only the claims of the named plaintiff."  *Moser v. Benefytt, Inc.*, 8 F.4th 872, 877 (9th Cir. 2021) (internal quotation marks omitted).

The majority overlooks this critical fact, treating XBS's acts of defending against *Ms. Hill's* claims as though they were directed at the class.  They were not.  Her claims are distinct from theirs, and XBS's acts of litigation against her were distinct as well.  Indeed, it was impossible for XBS to litigate against the class until the class was finally certified and given notice.

## 2. The Majority's New Forfeiture Rule Fails Even on Its Own Terms.

While pointing to the above three "acts" as faintly signaling XBS's intent to waive its arbitration right, the majority also appears to concede that each of these acts—indeed, all of XBS's litigation activities—considered individually was so "seemingly commonplace" that it could not reasonably be considered "an express disavowal of arbitral forums."  But that does not deter the majority,

because the real engine for its conclusion in this case is its leverage of the totality-of-the-circumstances test our court articulated in *Newirth*.**[9]** Refashioning that test into a catchall for whatever instincts members of a court might have, the majority intuits that XBS *must have* intended to waive its right to compel arbitration. It squints at the record until it sees such intent lurking in the background of all of XBS's litigation activities considered in toto. But as is often true, squinting too hard here distorts the view.

The majority points decisively to the amount of time that elapsed between the day Ms. Hill filed her complaint and XBS moved to compel arbitration, treating that as ironclad evidence that, all things considered, XBS implicitly yet

---

[9] Contrary to the majority's suggestions, I do not deny the validity of the actual totality-of-the-circumstances test that *Newirth* and its progeny lay out. I object only to the majority's stretching of that test beyond what fidelity to precedent and reason can brook, such that going forward a panel no longer need anchor its conclusions in anything concrete. As the majority effectively redefines the test today, a panel may invoke the "totality of the circumstances" to conclude that zero evidence of intentional waiver plus zero evidence of intentional waiver equals ample evidence of waiver. Apparently, there can be a forest even where there are no trees.

But my deeper and primary concern is that reliance on that standard should not supplant the more fundamental rule that waiver must always be intentional. As with application of multifactor balancing tests, courts depending on the totality of the circumstances should always be cautious to avoid effectively saying to litigants and the public: "just trust us, we know waiver when we see it." That concern is heightened where, as here, the defendant's intentionality is the touchstone of analysis. For all the same reasons that waiver requires intentional conduct to begin with, we should be loath to divine such intentionality by relying on some inscrutable standard that simply declares the whole to be greater than the sum of its parts.

intentionally waived its right to arbitrate. But nothing in our caselaw even suggests that how long a case lingers in its precertification phase is relevant to the analysis of waiver, let alone that it disposes of the question entirely. And by all accounts this is an odd case to use as a vehicle for creating such a new rule, as XBS moved to compel the very first day it could do so, i.e., the day after the notice administrator reported a final list of class members that included signatories to the 2002 DRP.

The majority also relies heavily on its view that XBS likely knew that some of its litigation activities against Ms. Hill could have derivative effects on members of the yet undefined class. As already explained, that rationale is deeply flawed. The well-established test is whether the defendant took any actions *inconsistent* with the right to arbitrate. Litigating against someone with whom you have no right to arbitrate (such as Ms. Hill), or litigating issues that you have no right to arbitrate (such as the class certification issues in this case), is not inconsistent with a right to arbitrate.

And until today, nothing in our waiver precedents suggested our clear and administrable "inconsistent-with-the-right-to-arbitrate" standard somehow changes by the mere fact that a defendant's non-arbitrable litigation activities might have foreseeable collateral consequences for possible arbitration with *others*. It will usually be that case that some (perhaps many) litigation arguments against a named plaintiff will be similarly relevant to the possible future claims of some members of the putative class. That does not mean the defendant is making those arguments against the absent class members. It is, in fact, impossible for the defendant to do that before the class is finally certified, because those absent class members are not

actually parties to the litigation. *See Bayer Corp.*, 564 U.S. at 313.

Instead of applying this well-established rule, the majority substitutes its intuition that, sure, XBS may have been *actually* litigating against Ms. Hill, but in its craven heart it was really going after the absent class members. I would stick to what XBS actually did and the actual legal import of its actions, not attempt to divine any motives it possibly had. And even if the majority's mind-reading was correct, such prescience by a class defendant is hardly nefarious. It simply does not matter whether XBS knew its litigation activities against Ms. Hill could *also* possibly affect then-absent class members. We should not penalize XBS just because its counsel were not so dull as to fail to foresee possible fortuitous collateral consequences of making certain arguments in litigating against Ms. Hill. We should penalize XBS only if it took actions that were *actually* inconsistent with a right to arbitrate. And none of the litigation actions against Ms. Hill were, because XBS had no right to arbitrate with her.

The majority seems to relatedly argue that it was the cumulative *impact* that XBS's litigation activities against Ms. Hill might have on future class members that implies XBS intended to waive its arbitration rights. For example, the majority highlights that XBS asked the district court to resolve its partial summary judgment motion before resolving the issue of class certification to "'obviate the need for certification.'" Such a request is common enough because it usually would be inefficient to litigate all the class certification issues only to have the case later resolved on summary judgment. Yet the majority has a hunch that, in this case, XBS wasn't *really* motivated by efficiency; that the request was just a ruse to resolve all issues related to the

2002 signatories in court.  Because there is no text in the summary judgment motion that makes that interpretation necessary, the majority invokes context even while providing none.  "XBS may have nominally been litigating against Hill at the time," the majority admits.  "But its strategic approach to the impending class certification reveals that XBS knowingly argued about the merits of all class members' claims, whether arbitrable or not, for the express purpose of obtaining a judicial order that would foreclose all class claims."  The majority regrettably fails to provide any reasoning or citation to support this intuition.

But more importantly, it ultimately does not matter whether its intuition is right or wrong.  It may or may not be true, as the majority says, that XBS's success in litigating various issues against Ms. Hill would have tolled a "death knell" for absent class members' claims.  Whatever validity an argument rooted in second-order death knells might have in poetry, it rings hollow in this court's legal analysis of waiver, even under the totality-of-the-circumstances standard.[10]  The test our court has applied until today has been whether a defendant acted inconsistently with an intent to arbitrate, not whether a Rube Goldberg machine exists whereby a hypothetical absent class member hypothetically might indirectly suffer a disadvantage in hypothetical future arbitration as a result of a class defendant's non-discretionary litigation activities against an entirely different party.

---

[10] *Compare* John Donne, Meditation 17, *in* Sermons on the Psalms and Gospels 243 (Evelyn M. Simpson ed., 1963) ("[N]ever send to know for whom the bell tolls; it tolls for thee."), *with Newirth*, 931 F.3d at 941.

### 3. The Majority's Strawmen

I suppose I should be flattered by the majority's lengthy response to this dissent, sometimes in footnotes that span multiple pages. If only "the sweet breath of flattery conquer[ed] strife." William Shakespeare, *The Comedy of Errors* act 3, sc. 1, l. 28. But alas not in this instance, because in defending its own position the majority repeatedly misrepresents mine, devastating a virtual army of strawmen. In light of the difficult argument the majority labors to make, the impulse to paint the contrary position as extreme is understandable. But it is important, I believe, to be as clear as possible about the differences between our positions—which includes, of course, what we *don't* disagree about. I have already clarified a few such misunderstandings. Two more merit brief correction.

First, the majority claims I disagree that a defendant may impliedly waive a right to compel arbitration, insisting that I argue "only direct evidence of waiver through an express disdain of the right to arbitrate can constitute acts inconsistent with that right." That's an obvious distortion of my position, as should be clear enough from the very first paragraph of this dissent. I agree with *Newirth* that the right to arbitrate can be impliedly waived; I disagree with the majority's creative reimagining of how that can happen.

Second, the majority charges me with embracing the suspect principle "that a party needs to have *present* authority to vindicate" its right to compel arbitration in order "to be able to take actions inconsistent with" that right, and then expatiates across multiple pages why that's wrong. I take no such position. My argument is not that a defendant cannot waive its right to compel arbitration before that right has ripened. A defendant obviously could do so. But the

majority can point to no evidence—and there is none—that XBS in fact demonstrated even the slightest real intent to waive its right to compel arbitration at any point in this case.

## II. CONCLUSION

Federal policy favors enforcement of arbitration agreements, and this court has long held that a defendant who possessed a right to compel arbitration can impliedly waive that right only if it acts in ways inconsistent with it. *Newirth*, 931 F.3d at 940. The majority today crowbars that narrow exception into a yawning new forfeiture rule with little in the way of a guiding principle other than a court's inscrutable gut instincts about a class defendant's hidden motives.

And all just to reward a named plaintiff and her counsel who knew since the infancy of this case that most of the class she purported to represent had arbitration agreements that, if properly enforced, could result in those class members being removed from her lawsuit. The majority strangely concludes that XBS rather than Ms. Hill and her counsel "l[aid] in the weeds" with respect to the 2002 arbitration agreement. I perceive quite differently who laid in the weeds.

First, this colorful metaphor implies stealth. But if XBS was trying to hide the 2002 arbitration agreement from Ms. Hill and her class counsel, it did a terrible job. It provided the 2002 DRP to Ms. Hill in response to her discovery requests back in 2013, shortly after she sued XBS and nearly seven years before the class was finally identified and XBS could move to compel arbitration against the 2002 signatories. So Ms. Hill and her counsel were fully aware of the 2002 DRP. And as explained, XBS continued to occasionally refer to the 2002 DRP with both Ms. Hill and the district court as it litigated class certification issues.

That's about as sneaky as a toddler playing hide-and-seek.

Second, the metaphor implies the ambusher seeks some advantage by remaining silent. But I can conceive of no advantage XBS might have expected by not explicitly asserting its right to later arbitrate once that right ripened, and the majority offers none. Or, for that matter, what advantage XBS could expect by not mentioning the 2002 DRP more often in opposing class certification. If anyone stood to gain a tactical advantage by intentionally ignoring the 2002 DRP it was Ms. Hill, because it forced XBS into a dilemma in the early stages of litigation. Either XBS would need to raise every imaginable merits defense against a class not yet defined even if those defenses were irrelevant and futile with respect to the only party then in the case—Ms. Hill—or else it would need to accept a nonzero risk that Ms. Hill could later beguile a court into thinking those defenses had been forfeited. The majority's result today does much to encourage such gamesmanship in the future by rewarding Ms. Hill and punishing XBS.

Trying to make a similar point through another familiar metaphor, the majority sternly insists that it "will not reward XBS's attempt to take a second bite from the apple" by permitting it to compel arbitration when there is a "strong inference that XBS wanted a *judicial* resolution on the merits." Although variations of this argument bob up repeatedly in the majority opinion, this metaphor also quickly goes to seed, primarily because XBS never took a *first* bite at any absent class member's apple: XBS never litigated any issue *against absent class members*, as opposed to Ms. Hill.

But the majority's do-over concern falls flat however you slice it. Even indulging the majority's fiction that XBS

was actually litigating against the class when it was really litigating against Ms. Hill, there still would only be one bite of the apple.   The example the majority references— litigation over whether Ms. Hill was a piece-rate worker— drives home the point.  Once that question was certified to the Washington Supreme Court in the litigation with Ms. Hill and authoritatively answered, it was not going to be "relitigated" by XBS against anyone, including absent class members.  Whatever the Washington Supreme Court ruled on the piece-rate question would obviously be authoritative and binding precedent, including in any later arbitrations. Here again, the majority justifies its unwarranted extension of waiver by reference to a concern that, upon closer inspection, collapses.

*   *   *

The majority today imposes a new duty on defendants to make certain arguments against class certification at that stage of the case or otherwise lose the ability to later compel arbitration once the right to do so matures.  The majority characterizes this as waiver, but it is more accurately understood as a new forfeiture rule.  XBS did nothing in this case to evince that it affirmatively intended to waive its right to arbitrate—it merely litigated against the named plaintiff Ms. Hill and opposed her attempt to certify a class.  That should not be enough to intentionally waive a merits defense wholly inapplicable to the named plaintiff, so I must respectfully dissent.